The **ASSOCIATION OF SETTLEMENT COMPANIES; Century Negotiations, Inc., Eagle One Debt Solutions, LLC,** Petitioners

v.

**DEPARTMENT OF BANKING,** Respondent.

Commonwealth Court of Pennsylvania.

Argued June 10, 2009.

Decided July 24, 2009.

Robert B. Hoffman, Harrisburg, for petitioner.

Kenneth L. Joel, Sr. Deputy Attorney General, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and SMITH–RIBNER, Judge, and PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge COHN JUBELIRER.

### I. Introduction

In this case we are asked to resolve *inter alia,* numerous constitutional challenges to the Debt Management Services Act (Act 117).[1] These challenges were brought via a Petition for Review (Petition) filed by two individual debt settlement services providers (DSS Providers), Century Negotiations, Inc. (Century), and Eagle One Debt Solutions, LLC (Eagle One), and a trade group representing a number of DSS Providers, The Association of Settlement Companies (collectively, Challengers). In their Petition, which was filed in this Court's original jurisdiction, Challengers argue that Act 117 is unconstitutional on its face and as applied to DSS Providers. Before this Court are Preliminary Objections in the nature of demurrers filed by the Department of Banking (Department) contending, *inter alia,* that Act 117 is not constitutionally infirm.

In conducting our review of these Preliminary Objections, there are several principles that we must consider. First, we are mindful of our Pennsylvania Supreme Court's statement as to the limits of our review in evaluating the work of the General Assembly:

At the outset, it is important to make clear that we are neither passing on the wisdom of the substantive provisions of this Act nor on whether [regulation of consumer debt services] in general is in the best interests of the citizens of our Commonwealth. These decisions are for the General Assembly. We are only considering the discrete legal issues that have been raised for our review primarily regarding the constitutionality of this piece of legislation.

*Pennsylvanians Against Gambling Expansion (P.A.G.E.) Fund, Inc. v. Commonwealth,* 583 Pa. 275, 288, 877 A.2d 383, 390–91 (2005).

■■■ Second, we are guided by our standard for resolving constitutional challenges to legislative actions. Our law provides a strong presumption that legislative enactments, as well as the manner in which legislation is enacted, do not violate the Constitution. *P.A.G.E.,* 583 Pa. at 292, 877 A.2d at 393. A party that challenges the constitutionality of a statute bears "a very heavy burden of persuasion" to overcome this presumption. *P.A.G.E.,* 583 Pa. at 292, 877 A.2d at 393. "Accordingly, a statute will not be declared unconstitutional unless it *clearly, palpably,* and *plainly* violates the Constitution [and a]ll doubts are to be resolved in favor of finding that the legislative enactment passes constitutional muster." *Id.*

■■■ Third, because we are in the early stages of this proceeding, we are guided by the principles of review for evaluating preliminary objections in the nature of a demurrer. In reviewing preliminary objections in the nature of a demurrer, all material facts averred in the complaint, and all reasonable inferences that can be drawn from them, are admitted as true. *Vattimo v. Lower Bucks Hospital, Inc.,* 502 Pa. 241, 244, 465 A.2d 1231, 1232 (1983); *Fletcher v. Pennsylvania Property & Casualty Insurance Guaranty Association,* 914 A.2d 477, 479 n. 2 (Pa.Cmwlth.

---

1. Act of October 9, 2008, P.L. 1421, No.2008– 117, 63 P.S. §§ 2401–2449.

2007). "The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it." *Vattimo,* 502 Pa. at 244, 465 A.2d at 1232–33 (citations omitted).

With this background, we turn to the averments in the Challengers' Petition and the corresponding demurrers raised to these averments by the Department.

██ Challengers' Petition contains the following averments. Act 117 was signed into law on October 9, 2008 and became effective on February 6, 2009. Act 117 provides for the regulation and licensing of DSS Providers and debt management services providers (DMS Providers). Section 2 of Act 117 defines "debt management services" as "[t]he service of receiving funds periodically from a consumer and then distributing those funds to creditors of the consumer in partial or full payment of the consumer's personal debts." 63 P.S. § 2402. Act 117 also defines "debt settlement services" as:

> [a]n action or negotiation made on behalf of a consumer with that consumer's creditors for the purpose of the creditor forgiving part or all of the principal of the debt incurred or credit extended to that consumer. The term shall not include any action taken to convince a creditor to waive any fees or charges.

63 P.S. § 2402. According to Challengers' Petition,[2] DSS Providers:

> 11. ... are one of several debt reduction options available to persons who have substantial unsecured debt that they are unable to pay off, are in default on, or are having difficulty paying off in a timely/economically feasible way (*e.g.,* unable to pay minimum balances on credit cards). Other options for persons in that situation include working with a debt management company or declaring bankruptcy. Debt settlement is often the only affordable option for a consumer who cannot pay back their debt due to a hardship.
>
> 12. Debt settlement companies act on behalf of consumer debtors to help them settle their unsecured debts at a lesser amount than owed to each of their creditors. They do this by directly negotiating with creditors to reduce the amount the creditors will accept as payment in full. Debt settlement companies also help a debtor take constructive action that will facilitate payment of that reduced amount, such as helping the debtor establish a monthly saving program with funds set aside to pay any settlement(s) the debt settlement company achieves.
>
> 13. Most debt settlement companies, and all that are members of [the Association of Settlement Companies], do not hold, handle or control their client's funds.
>
> 14. Debt settlement companies receive fees for their services, which typically total between 14% and 20% of the debt that is originally committed by the debtor under the debt settlement program agreement.

(Petition ¶¶ 11–14.) Challengers describe DMS Providers as follows:

---

**2.** We give particular attention to Challengers' characterization of DSS and DMS Providers' business models because, when considering preliminary objections, this Court will consider to be true facts "that are well-pleaded, material and relevant," along with "such reasonable inferences as may be drawn from these facts." *Fletcher v. Pennsylvania Property & Casualty Insurance Guaranty Association,* 914 A.2d 477, 479 n. 2 (Pa.Cmwlth.2007) (quoting *Ohio Casualty Group of Insurance Companies v. Argonaut Insurance Co.,* 92 Pa. Cmwlth. 560, 500 A.2d 191, 194 (1985)).

21. Debt management and debt settlement companies provide distinct services to consumers.

22. Most debt management companies receive significant funding by the creditors to whom consumers owe their debts.

23. Debt management companies do not negotiate with creditors on behalf of consumers to reduce the principal balance of a debt (as debt settlement companies do) but focus on lowering monthly payments and/or securing a reduced annual percentage rate of interest for payment of the full amount owed over a fixed period of time, usually 3–5 years.

24. Debt management companies work only with creditors that have agreed to participate in debt management programs and focus on securing a reduced annual percentage rate of interest on debt.

25. Debt management companies typically establish a repayment plan with all participating creditors and establish an amount the client will pay monthly. The debtor then makes a single monthly payment in that amount to the debt management company, which then disburses the payment to the creditors on a *pro rata* basis.

(Petition ¶¶ 21–25.)

Challengers allege that Act 117, as originally conceived, was intended to regulate only DMS Providers and that DSS Providers were included at the last minute. (Petition ¶¶ 29–30, 37–38.) Prior to the passage of Act 117, both DSS Providers and DMS Providers[3] were permitted to operate within the Commonwealth. (Petition ¶¶ 16–18, 27.) Act 117 now provides, among other things, that DMS and DSS Providers must be licensed in order to provide services in the Commonwealth. Section 3 of Act 117, 63 P.S. § 2403. With regard to DMS Providers, Section 3(a) provides that in order to operate within the Commonwealth a DMS Provider must be "licensed by the [D]epartment under this act." 63 P.S. § 2403(a). With regard to DSS Providers, however, Section 3(b) states that in order to operate in the Commonwealth, a DSS Provider must be "licensed by the [D]epartment under this act *and ... operating in accordance with regulations promulgated by the [D]epartment regarding the conduct of debt settlement services.*" 63 P.S. § 2403(b) (emphasis added). In their Petition, Challengers allege that the Department has stated that it cannot license DSS Providers until it promulgates regulations regarding debt settlement services. Challengers allege that the Department will not have regulations in place covering DSS Providers until months or years after the effective date of Act 117, and that DSS Providers will not, therefore, be able to continue operating in the Commonwealth.

Therefore, the Challengers brought their Petition in this Court's original jurisdiction seeking declaratory and injunctive relief, attorneys' fees, and asking this Court to determine that Act 117 is unconstitutional because it:[4] (1) violates the Delegation Doctrine found at article II, section 1 of the Pennsylvania Constitution (Petition, Count V); (2) violates the single subject doctrine found at article III, section 3 of the Pennsylvania Constitution (Petition, Count II); (3) violates DSS Providers' rights to equal protection under the

---

**3.** For-profit DMS Providers could not operate in the Commonwealth due to laws prohibiting the pooling of debt.

**4.** We have chosen to address the Department's Preliminary Objections in a different order than that in which they were presented by the Department or in which the underlying allegations were raised in Challengers' Petition.

United States and Pennsylvania Constitutions (Petition, Count I); (4) violates DSS Providers' rights to due process under the United States and Pennsylvania Constitutions (Petition, Count IV); and (5) violates the Contracts Clauses of the United States and Pennsylvania Constitutions (Petition, Count III). For relief on these claims, Challengers' Petition asks this Court to declare Act 117 unconstitutional and enjoin the Department from enforcing it against DSS Providers. With regard to the claims under the United States Constitution, Challengers also seek attorneys' fees pursuant to 42 U.S.C. § 1988.[5]

In response to the Petition, the Department filed Preliminary Objections in the nature of demurrers to each count of Challengers' Petition, pursuant to Rule 1028(a)(4) of the Pennsylvania Rules of Civil Procedure,[6] on the grounds that Act 117 does not violate the United States or Pennsylvania Constitutions. The Department also filed Preliminary Objections pursuant to Pennsylvania Rule of Civil Procedure No. 1028(a)(4) to Challengers' federal constitutional claims brought pursuant to 42 U.S.C. § 1983 on the grounds that the Department is not an entity which can be sued under Section 1983. These Preliminary Objections are now before this Court.

While Challengers ultimately bear a heavy burden in rebutting the presumption of constitutionality of the statute, we have sufficient doubt that the law would preclude recovery as to several of these counts that we are compelled at this preliminary stage to overrule most of the Department's Preliminary Objections. For the reasons set forth below, we sustain the Department's Preliminary Objections as to the Challengers' claims under the United States Constitution brought pursuant to Section 1983. We overrule the remainder of the Department's Preliminary Objections and allow the matter to proceed.

## II. 42 U.S.C.1983 Claim

■ Initially, this Court addresses the Department's Preliminary Objection in the nature of a demurrer to Challengers' arguments that Challengers' claims under the United States Constitution are brought pursuant to 42 U.S.C. § 1983, and that Challengers may, therefore, seek attorneys' fees pursuant to 42 U.S.C. § 1988. The Department argues that no action pursuant to Section 1983 may be maintained because the Department is not a "person" to whom Section 1983 may apply, per *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45. We agree. The Department, as a branch of the Commonwealth, is not a person for purposes of Section 1983 and, therefore, Challengers may not be awarded attorneys' fees pursuant to Section 1988 in this case. We, therefore, sustain this Preliminary Objection of the Department.

## III. Delegation

■ We next consider the Department's demurrer to Challengers' claim that Act 117, with respect to DSS Providers, is a standardless delegation of legislative authority and, therefore, violates article II, section 1 of the Pennsylvania Constitution, which provides that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly." Pa. Const. art. II,

---

**5.** By order dated January 23, 2009, this Court entered a preliminary injunction enjoining the Department from enforcing Act 117 with respect to Challengers until the ultimate disposition of this matter.

**6.** Rule 1028(a)(4) provides that:

(a) Preliminary objections may be filed by any party to any pleading and are limited to the following grounds:

 (4) legal insufficiency of a pleading (demurrer)....

Pa. R.C.P. 1028(a)(4).

§ 1. Article II, section 1 embodies the fundamental concept that only the General Assembly may make laws, and "cannot constitutionally delegate the power to make law to any other branch of government or to any other body or authority." *Blackwell v. State Ethics Commission*, 523 Pa. 347, 359–60, 567 A.2d 630, 636 (1989). While the General Assembly may "delegate authority and discretion in connection with the execution and administration of a law," to do so, it must "establish primary standards and impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the enabling legislation." *Id.* In *Gilligan v. Pennsylvania Horse Racing Commission*, 492 Pa. 92, 422 A.2d 487 (1980), the Pennsylvania Supreme Court stated that the "principal limitations" on the General Assembly's power to delegate such authority "are twofold: (1) the basic policy choices must be made by the Legislature; and (2) the 'legislation must contain adequate standards which will guide and restrain the exercise of the delegated administrative functions.'" *Id.* at 96, 422 A.2d at 489 (citations ˙omitted) (quoting *Chartiers Valley Joint Schools v. County Board of School Directors of Allegheny County*, 418 Pa. 520, 529, 211 A.2d 487, 493 (1965)).

As discussed above, we must review Act 117 on its face, and accept as true all factual averments contained in Challengers' Petition for Review. Section 3(b) of Act 117 states that DSS Providers must: (1) be licensed by the Department in accordance with Act 117; and (2) operate "in accordance with *regulations promulgated by the [D]epartment regarding the conduct of debt settlement services.*" 63 P.S. § 2403(b) (emphasis added).

 Act 117 contains adequate policy choices with regard to the *licensing* of DSS Providers and contains sufficient standards to guide and restrain the De-

partment in carrying out these policy choices. In determining whether an act expresses basic policy choices, a reviewing court should look to the act's "purpose, its nature and its reasonable effect; [courts] are not limited to the mere letter of the law but must look beyond the letter to determine its true purpose and effect." *Water & Power Resources Board v. Green Springs Co.*, 394 Pa. 1, 5–6, 145 A.2d 178, 181 (1958). With this in mind, looking at Act 117 as a whole, it appears that the Legislature made the basic policy choices that DSS and DMS Providers should be licensed to ensure, among other things, that these providers are financially stable, and are insured against malfeasance and fraud. For example, Section 5 of Act 117, which provides for licensure applications, requires applicants to submit with their applications:

(7) The audited financial statement from the applicant's most recent fiscal year, including an audit opinion from an independent certified public accountant.

(8) A copy of a liability or fidelity insurance policy that insures against dishonesty, fraud, theft or other malfeasance on the part of the applicant's employees, officers, directors or principals.

63 P.S. § 2405(7)-(8). These provisions indicate that the intended purpose and effect of Act 117's licensure provisions are to ensure that DSS and DMS providers are financially solvent and provide some margin of protection from fraud to consumers.

Similarly, the Legislature provided guidance and restraint to the Department in implementing these purposes in the form of Section 10 of Act 117, 63 P.S. § 2410, which sets forth the reasons the Department may refuse, suspend, revoke or deny a license. Per Section 10, the Department may refuse or deny a license application if the applicant has, among other things:

(5) Been convicted of or pleaded guilty or nolo contendere to a crime of moral

turpitude or to an offense graded as a felony.

. . . .

(9) Demonstrated negligence or incompetence in performing an act for which the applicant is required to hold a license under this act.

. . . .

(12) Becomes insolvent, meaning that the liabilities of the applicant or licensee exceed the assets of the applicant or licensee or that the applicant or licensee cannot meet the obligations of the applicant or licensee as they mature or is in such financial condition that the applicant or licensee cannot continue in business with safety to the customers of the applicant or licensee.

7. Section 14, entitled "Requirements for providing debt management services" states:

A licensee shall provide debt management services in accordance with the following requirements:

(1) The licensee shall provide each consumer for whom it provides debt management services with a consumer education program at no cost to the consumer.

(2)(i) A licensee may only provide debt management services in accordance with a written debt management services agreement entered into between the licensee and the consumer. Before the licensee and consumer enter into a debt management services agreement, the licensee shall prepare an analysis of the consumer's financial situation and a budget for the consumer. The analysis shall include a good faith determination whether the consumer will benefit from debt management services and an explanation of that benefit. If the analysis determines that the consumer will not benefit from debt management services, the licensee shall not offer debt management services to the consumer.

(ii) The licensee may communicate with the consumer by electronic mail or the Internet, but shall not enter into a debt management services agreement unless a certified credit counselor employed by the licensee and the consumer have orally reviewed the analysis, the budget and the

63 P.S. § 2410(5), (9), (12). Because the Legislature has made basic policy choices in delegating the authority to license DSS Providers to the Department and has provided guidance and restraint in the exercise of this authority, the delegation of authority in Act 117 to *license* DSS Providers in accordance with Act 117 is a legitimate delegation of authority.

 However, Act 117, on its face, provides the Department with no guidance or restraint regarding the *regulation* of "the conduct of debt settlement services." Almost the entirety of Act 117 is taken up with provisions providing for the regulation of debt management services. For example, Section 14 of Act 117, 63 P.S. § 2414, contains twenty-five subsections dealing with the manner in which debt management services are to be provided.[7]

debt management services agreement through a person-to-person discussion. The licensee shall provide copies of the analysis, budget and debt management services agreement to the consumer.

(3) A debt management services agreement shall be in writing, signed by the licensee and the consumer, in plain English and printed in at least 12-point type. It shall contain at least the following information:

(i) The name, address and telephone number of the consumer and of the licensee.

(ii) The license number of the licensee.

(iii) A description of the debt management services to be provided to the consumer.

(iv) A description of the fees that will be charged to the consumer.

(v) The name and address of the depository institution where the trust account into which the consumer's funds, paid to the licensee for disbursement to the consumer's creditors, is located.

(vi) A list of each of the consumer's creditors that the licensee in good faith reasonably expects to participate in the licensee's management of the consumer's debt, including the amount owed to each creditor and the schedule of payments to be made to each creditor.

(vii) A list of each of the consumer's creditors that the licensee in good faith reasonably expects not to participate in the licensee's management of the consumer's debt.

(viii) A schedule of the payments that the consumer must make to the licensee, including the amount of each payment, the date it is due and the form in which it must be made.

(ix) Disclosure of any fees that either the consumer must make to the licensee or that the licensee will retain from each of the consumer's payments to the licensee.

(x) A notice, in bold print, that the consumer's participation in the debt management services agreement may negatively impact the consumer's credit rating or credit score.

(xi) Disclosure that the licensee may receive compensation from the consumer's creditors for providing debt management services to the consumer.

(xii) Notice that either party may terminate the debt management services agreement upon ten days' written notice to the other party.

(xiii) Notice that if the debt management services agreement is terminated, the consumer is entitled to a prompt refund of any payments made that have not yet been disbursed to the consumer's creditors.

(xiv) An explanation of the way in which disputes that arise under the debt management services agreement will be resolved.

(xv) An explanation of applicable privacy laws.

(4) The licensee shall provide each consumer participating in a debt management services agreement with at least quarterly statements setting forth the payments received from the consumer and the disbursements made to the consumer's creditors.

(5) Within two business days of receiving any payment, the licensee shall deposit all payments received from consumers under debt management services agreements into a trust account established for the benefit of the consumers to whom the licensee is furnishing debt management services. All money paid to a licensee by or on behalf of a consumer for distribution to creditors pursuant to a debt management services agreement is held in trust. Any interest earned from money held in trust on behalf of a consumer shall be used for the benefit of the consumer. The trust account shall be in a federally insured depository institution and is subject to the following:

(i) Except as provided in subparagraph (iii), money held in trust by a licensee is not property of the licensee or any designee. The money shall not be available to creditors of the licensee, except for a consumer from whom or on whose behalf the licensee received the money, to the extent the money has not been disbursed to creditors on behalf of the consumer.

(ii) In connection with the trust account, a licensee shall:

(A) maintain separate records of accounts for each individual to whom the provider is furnishing debt management services; and

(B) disburse money paid by or on behalf of the individual to creditors of the individual as disclosed in the debt management services agreement, except that:

(I) The licensee may delay payment to the extent that a payment by the consumer does not comply with the terms of the debt management services agreement because it is not sufficient to pay designated creditors.

(II) If the debt management services agreement provides for regular periodic payments to creditors, the licensee shall make payments to comply with the due dates established by each creditor.

(III) The licensee may promptly correct any payments that are not made or that are misdirected as a result of an error by the licensee or any person in control of the trust account and reimburse the consumer for any costs or fees imposed by a creditor as a result of the licensee's failure to pay a creditor in a timely manner.

(iii) A licensee may commingle money in a trust account established for the benefit of the consumers who have a debt management services agreement or debt settlement services agreement with the licensee and to whom the licensee is furnishing debt management services or debt settlement services. In the event a licensee deposits a consumer's entire payment to the licensee, including both money for disbursement to creditors and fees owed to the licensee, the licensee may accept payment of fees owed to it from the trust. All money in the trust account established for the benefit of consumers however, shall be accounted for separately, including an accounting for fees owed to the licensee. No other money shall be deposited into the trust account and the money in the account may only be used for the purposes expressed in this subparagraph.

(iv) A trust account shall at all times have a cash balance equal to the total amount held in all consumer accounts.

(v) The licensee shall reconcile the trust account at least once a month, which shall include reconciling the cash balance in the trust account with the sum of the balances in each consumer account. If the licensee has more than one trust account, each trust account must be individually reconciled.

(vi) If a licensee discovers, or has reasonable suspicion of, embezzlement or other unlawful appropriation of money held in trust, the licensee shall immediately notify the department.

(vii) If a consumer terminates a debt management services agreement with a licensee, the licensee shall promptly refund to the consumer all money paid by or on behalf of the consumer which has not been paid to creditors and interest accrued thereon, less fees that are payable to the licensee as authorized by this act.

(6) The licensee shall disburse a consumer's funds to the consumer's creditors in a timely manner based on the availability of the funds pursuant to the consumer's debt management services agreement. In the event that a consumer makes only a partial payment as required by a debt management services agreement, the licensee shall disburse the available funds to creditors prior to the licensee collecting its own fees from the consumer's partial payment. In the event that a consumer fails to resolve any scheduled payment deficiency within 45 days of the deficiency occurring, a licensee may terminate the debt management services agreement in accordance with the agreement.

(7) The licensee or any business entity in which any director, owner, officer, employee or principal of the licensee, or any member of such person's immediate family as defined in 65 Pa.C.S. § 1102 (relating to definitions), has an equitable, beneficial or other ownership interest shall not purchase any debt or obligation of a consumer.

(8) The licensee or any business entity in which any director, owner, officer, employee or principal of the licensee, or any member of such person's immediate family as defined in 65 Pa.C.S. § 1102, has an equitable, beneficial or other ownership interest shall not lend money or provide credit to a consumer.

(9) The licensee or any business entity in which any director, owner, officer, employee or principal of the licensee, or any member of such person's immediate family as defined in 65 Pa.C.S. § 1102, has an equitable, beneficial or other ownership interest shall not offer or provide credit insurance to a consumer.

(10) The licensee or any business entity in which any director, owner, officer, employee or principal of the licensee, or any member of such person's immediate family as defined in 65 Pa.C.S. § 1102, has an equitable, beneficial or other ownership interest shall not obtain a mortgage or other security interest in the property of a consumer.

(11) The licensee shall not operate as a collection agency or debt collector.

(12) The licensee shall not structure a consumer's debt management services agreement in a way that results in the negative amortization of any of the consumer's debts.

(13) The licensee shall not compromise any debt of a consumer unless the compromise benefits the consumer and the consumer has approved the proposed compromise in writing.

(14) The licensee shall have written policies describing its safeguards against conflicts of interest in the conducting of its business.

(15) The licensee shall not disseminate information, including by advertising, regarding its debt management services in any way that is false, misleading or deceptive.

(16) The licensee or any business entity in which any director, owner, officer, employee or principal of the licensee, or any member of such person's immediate family as defined in 65 Pa.C.S. § 1102, has an equitable, beneficial or other ownership interest, shall not offer, pay or give a gift, bonus, premium, reward or any other compensation to a person for referring a consumer to the licensee.

(17) The licensee shall not directly or indirectly accept, offer, pay, provide, give or receive any gift, bonus, premium, reward or any other compensation to or from any person, including, but not limited to, any for-profit parent, subsidiary or the affiliate of any licensee and any entity whether or not legally recognized by the Commonwealth for business purposes that provide debt management services for referring a consumer to the licensee or to another licensee or person.

(18) The licensee or any business entity in which any director, owner, officer, em-

Section 14 describes in detail the requirements for a debt management services agreement, describes the manner in which DMS Providers must pay funds committed to them by their clients, prohibits DMS providers from acting as debt collectors, prohibits DMS providers from compromising a client's debt in a way that will harm the client or without the client's permission, along with numerous other detailed provisions regarding the way in which a DMS Provider may conduct its business. In striking contrast, Act 117 contains no comparable provisions regarding DSS Providers. Act 117 is silent on how debt settlement services are to be provided, what an agreement to provide debt settle-ment services must contain, or any other provisions similar to the ones established for DMS Providers. There are no standards to guide the Department with regard to the activities of DSS providers.

Likewise, there are no standards provided regarding fees to be charged by DSS Providers. Section 15 of Act 117, 63 P.S. § 2415 provides for the monthly maintenance fees that a DMS Provider is allowed to charge, the contributions from clients toward a debt management plan that a DMS Provider may accept, the education and counseling fee a DMS Provider may charge, and provides that a DMS Provider may not charge fees without a debt management plan agreement.[8] Section 15

---

ployee or principal of the licensee, or any member of such person's immediate family as defined in 65 Pa.C.S. § 1102, has an equitable, beneficial or other ownership interest, shall not offer or pay an incentive, including a gift, bonus, premium, reward or any other compensation to a consumer for executing a debt management services agreement with the licensee.

(19) A licensee shall not, except as provided in this section, initiate a transfer to or from an individual's account at a financial institution or with another person unless the transfer is one of the following:

(i) a return of money to the individual's account; or

(ii) before termination of debt management services, properly authorized by the debt management services agreement and this section and for either of the following:

(A) payment to one or more creditors pursuant to a debt management services agreement; or

(B) payment of a fee permitted by this act and as part of a debt management services agreement.

(20) The licensee shall not disclose the identity or identifying information of a consumer or the identity of the consumer's creditors except as permitted by Federal law. Disclosure may be made:

(i) to the department;

(ii) to a creditor of the consumer, to the extent necessary to secure the cooperation of the creditor in the debt management services agreement; or

(iii) as is necessary to administer the debt management services agreement.

(21) The licensee that primarily communicates with a consumer in a language other than English shall provide the debt management services agreement and any other documents or disclosures required by this act to the consumer in that other language.

(22) The licensee shall not delegate any of its duties or obligations under this act or a debt management services agreement to any person who is not licensed pursuant to this act and to whom this act is applicable.

(23) The licensee shall have a toll-free telephone number that shall be prominently displayed on the licensee's literature and advertising.

(24) The licensee shall not compensate its employees on the basis of a formula that incorporates the number of consumers the employee induces to enter into debt management services agreements or the amount of debt included in a debt management services agreement.

(25) A licensee shall maintain a communications system, staffed at a level that reasonably permits inquiring persons and clients to individually speak and discuss with counselors or a customer services representative of the licensee during regular business hours.

63 P.S. § 2414.

**8.** Section 15 provides in its entirety:

(a) Limitation.—A licensee may charge a fee of not more than $50 for an initial consultation with a consumer, provided that the consultation includes a consumer education program.

does not similarly specify the fees that DSS Providers are permitted to charge. Additionally, Section 15, if read literally, could prohibit DSS Providers from charging their clients any fee other than the actual cost of pulling the clients' credit reports and fees for dishonored checks.

In all, the term "debt management" appears 84 times in Act 117, while the term "debt settlement" appears only approximately thirteen times. Act 117 does not, on its face, provide sufficient standards to guide the Department on how DSS Providers are to provide debt settlement services or as to what fees DSS Providers may charge. Act 117 does not establish operating standards for the Department to follow in promulgating regulations regarding DSS Providers. Without such standards, we can not find that the Department has a legitimate delegation of authority to promulgate regulations affecting DSS Providers and that the Department can require DSS Providers to operate in accordance with such regulations per the terms of Section 3(b).

The Department argues that the provisions that specifically apply to DMS Providers could also apply to DSS Providers. However, Act 117 contains specific and different definitions for DMS and DSS Providers, and certain provisions of the

(b) Monthly maintenance fee.—When a consumer and a licensee have entered into a *debt management services* agreement, the licensee may charge the consumer a monthly maintenance fee not to exceed $10 times the number of accounts initially included under the agreement, provided that the total monthly fee may not exceed $50.

(c) Insufficient funds fee.—A licensee may collect a fee for a subsequent dishonored check or instrument taken in payment, not to exceed the service charge permitted to be imposed under 18 Pa.C.S. § 4105 (relating to bad checks).

(d) Actual cost.—A licensee may charge a consumer for the actual cost in requesting the consumer's credit report.

(e) Contributions prohibited.—A licensee shall not require or accept any contribution from a consumer on a *debt management plan* for services regulated pursuant to this act unless otherwise restricted by regulations promulgated by the department pursuant to this act.

(f) Education or counseling fee.—A licensee may not charge a consumer who enters into a *debt management services* agreement any fee for providing education or counseling. In the event that a consumer receives education or counseling from a licensee subject to a fee or charge without entering into a debt management services agreement and subsequently enters into a *debt management services* agreement with the licensee within four months of beginning the education or counseling, the licensee shall refund the fee charged for the education or counseling.

(g) Fees subject to debt management plan agreement.—A licensee may not impose charges or receive payment for *debt management services* until the licensee and the consumer have signed a debt management services agreement.

(h) *No other fees permitted.—A licensee shall not charge a consumer any fees other than those described in this section or by regulation promulgated by the department for services regulated pursuant to this act.*

(i) Fee limits.—For the 12–month period beginning with the effective date of this act, and annually thereafter, the fee limits provided in this section shall be increased by the percentage of change, if any, in the Consumer Price Index for All Urban Consumers for the Pennsylvania, New Jersey, Delaware and Maryland area for the most recent 12–month period for which figures are officially reported by the United States Department of Labor, Bureau of Labor Statistics, immediately prior to the date the adjustment is due to take effect, but in no event shall deflation result in a negative cost-of-living adjustment.

63 P.S. § 2415 (emphasis added). While Section 15(a) might at first glance appear to apply to both DSS and DMS Providers, Section 2 of Act 117, 63 P.S. § 2402, defines a "consumer education program" as an education program offered to a consumer prior to offering the consumer a debt management services agreement. Therefore, it is questionable whether a DSS Provider would ever, or, indeed, could, offer a consumer education program.

statute appear to apply only to DMS Providers. We would essentially be adding the term "debt settlement services" to the sections where the Legislature specified only "debt management services." Given that the Legislature defined such services differently, provided for their licensure differently, and set forth their requirements differently, we can not do so. This Court can not simply look at the entire Act and infer that the Legislature desired that the standards it provided with respect to DMS Providers also guide the Department with respect to DSS Providers. *See Bell Telephone Company of Pennsylvania v. Driscoll,* 343 Pa. 109, 115, 21 A.2d 912, 915 (1941) (holding that where a legislative provision lacked an explicit standard to guide an agency, such guidance could not be found "by reference to the whole act").

In *Driscoll,* Bell Telephone Company of Pennsylvania (Bell) challenged a statute which provided, in relevant part, that "[n]o public utility ... shall, without the prior approval of the [Public Utility C]omission, make effective or modify any contract with an affiliated interest." *Driscoll,* 343 Pa. at 110 n.*, 21 A.2d at 913 n. * (quoting the then-current provision of Section 702 of the Public Utility Law of 1937, *as amended* by the Act of September 28, 1938, P.L. 44, 66 P.S. § 1272.) Bell argued that this provision was a standardless delegation of legislative authority to the Public Utility Commission (Commission). The Pennsylvania Supreme Court agreed, stating:

There is no explicit standard set up in this section to guide the commission and we do not understand that the appellants contend that there is. They seek to find such guide by reference to the whole act. The appellants' argument becomes somewhat hard to follow at this point for they do not make clear whether the alleged implicit standard is merely public interest or something more definite. The form of this section would seem to indicate that the legislature did not intend to set up any standard for the commission in approving contracts, for its power to approve or disapprove is untrammeled by any conditions while the right of the commission to withdraw its approval previously given is conditioned on a finding of public interest.

Even if we were to consider that public interest can be implied as the standard for approval, that term would not be a proper standard unless further defined or limited in its meaning. To hold otherwise would be to reject the rule that the legislature may not delegate its authority to legislate since in any such delegation there is an implication that the power will be exercised in the public interest. Before any commission can decide whether a contract is contrary to public interest, it is necessary to find what is or what is not in the public interest. The power to make such determination rests with the legislature and without such declaration the commission would be without a standard or criterion. The phrase "public interest" as used in this connection is "a concept without ascertainable criterion."

*Id.* at 115–16, 21 A.2d at 915–16. The Supreme Court acknowledged that the approval of utilities' contracts by the Commission might further the Legislature's purpose of regulating rates and ensuring adequate service. However, the Court held that it was still necessary for the Legislature to provide standards to guide the Commission in approving or disapproving contracts in furtherance of this goal. *Id.* at 117–19, 21 A.2d at 916–17.

The Department argues that Act 117 is similar to other legislation that the Pennsylvania Supreme Court or this Court has found to constitute legitimate delegations of authority in cases such as *Chartiers Valley.* In *Chartiers Valley,* school districts and taxpayers challenged what was

commonly known as the "School Reorganization Act of 1963"[9] on the ground that it unconstitutionally delegated legislative authority to the State Board of Education. With respect to whether the School Reorganization Act of 1963 contained sufficient guidelines and limitations on the authority granted to the State Board of Education, the Supreme Court stated:

> More specifically, in Section 293, which, inter alia, provides that the Council of Basic Education is to approve such organization plans "as it deems wise", the Act is *most specific* in revealing its purpose and the results which the Legislature sought to accomplish. The Section sets up two bases for approval by the Council of Basic Education, one primarily within the discretion and judgment of the Council and the other essentially mandatory if specified conditions exist. Both these bases reflect the primary legislative objective of reorganization in the direction of fewer and larger units. The "mandatory" approval requirement is only applicable under conditions *explicitly* barring any reduction in the size of individual administrative units or any increase in the total number of units. The "discretionary" approval provision is *even more explicit in setting forth the Legislature's norm* as to the minimum appropriate size of a school district for efficient and effective education under ordinary conditions. No plan is to be approved in which any proposed school district contains "a pupil population of less than four thousand (4,000)" unless unusual, special factors require it.

> To achieve the Legislature's announced objectives, the Act establishes a *detailed procedure* which utilizes local school officials and other experts in the field of education at various local, district, and county levels in the review and final approval of reorganization plans as well as in the initial formulation of those plans. That procedure makes it clear that the legislative objective embodied in the Act is the prompt and expeditious reorganization of the Commonwealth's public school system in order to accomplish fewer and larger administrative units.

*Chartiers Valley,* 418 Pa. at 531–32, 211 A.2d at 493–94 (footnote omitted) (emphasis added).

Unlike in *Chartiers Valley,* here, the Legislature has provided no norm according to which DSS Providers are to be regulated, either explicitly or otherwise. We find this case to be more similar to *Driscoll.* In *Driscoll,* the Supreme Court could find no standards with respect to the Commission's authority to authorize utilities' contracts other than the broad purpose that such approval be in the interest of the public good, regulating rates, and ensuring adequate service. As in *Driscoll,* we are presented with a statute with no explicit guidelines with respect to the content of the regulations to be adopted regarding DSS Providers, other than that such regulations be aimed at protecting consumers. Per *Driscoll,* we can not simply look at the entire act and graft the specific guidance provided by the Legislature to the Department with regard to DMS Providers onto the grant of authority to regulate DSS Providers.

For these reasons, we overrule the Department's Preliminary Objection in the nature of a demurrer to Challengers' allegation that Act 117 is an unconstitutional delegation of legislative authority with respect to DSS Providers.

### IV. Single Subject

■ We next turn to the Department's Preliminary Objection in the nature

---

9. Act of August 8, 1963, P.L. 564, *as amended,* 24 P.S. § 2–202.

of a demurrer to Challengers' assertion that Act 117 violates article III, section 3 of the Pennsylvania Constitution. Section 3 provides that "[n]o bill shall be passed containing more than one subject, which shall be clearly expressed in its title." Pa. Const. art III, § 3. The title of Act 117 reads:

> AN ACT Providing for the licensure of persons providing debt management services and for the powers and duties of the Department of Banking; requiring surety bonds; prohibiting certain fees and costs; providing for debt management plans; and prohibiting certain acts by persons providing debt management services.

Act 117. Challengers argue that Act 117 violates article III, section 3, because it contains only references to "debt management services" and "debt management plans" and does not contain any reference to "debt settlement services." In order to successfully challenge a bill pursuant to article III, section 3, a challenger must show "either (1) that the legislators and the public were actually deceived as to the act's contents at the time of passage, or (2) that the title on its face is such that no reasonable person would have been on notice as to the act's contents." *In re Estate of Rochez*, 511 Pa. 620, 627, 515 A.2d 899, 902 (1986). The Department argues that the Pennsylvania Supreme Court has generally construed a bill's purpose and title broadly, citing *P.A.G.E.* as an example.

In *P.A.G.E.*, the Supreme Court of Pennsylvania considered a challenge to the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa.C.S. §§ 1101–1904. The Supreme Court described the changes that the Gaming Act underwent as it proceeded toward its enactment as follows:

> ... HB 2330 was introduced on February 3, 2004. It was titled "An Act Providing for the Duties of the Pennsylvania State Police Regarding Criminal History Background Reports for Persons Participating in Harness or Horse Racing." At this point in time, the bill dealt exclusively with the Pennsylvania State Police providing support to the State Harness and Horse Racing Commissions by performing criminal history checks and the verification of fingerprints of applicants for licensure under the Race Horse Industry Reform Act of 1981. It was one page in length. (H.B. 2330 Printer's No. 3251).
>
> Thereafter, the bill went through three considerations in the House and two considerations in the Senate. In the last consideration in the Senate on Thursday, July 1, 2004, the content of the bill was amended. Additionally, the bill's title was changed to express the multiple amendments made to the bill. These amendments were extensive, increasing the length of the bill from one page to 145 pages which included seven chapters and 86 sections. The bill as amended included the creation of the Pennsylvania Gaming Control Board ("Gaming Control Board" or "Board"), the issuance of gambling licenses authorizing the creation of a variety of slot machine casinos, the generation and distribution of revenues from the licenses, the creation of numerous funds including the Gaming Fund, the Pennsylvania Horse Race Fund, the Gambling and Economic Development and Tourism Fund, the Property Tax Relief Fund as well as a Compulsive and Problem Gambling Treatment Fund. Additionally, the amended bill contained a chapter regarding administration and enforcement and provided for exclusive jurisdiction in our Court regarding disputes over the issuance of licenses and challenges to the Gaming Act.

*P.A.G.E.*, 583 Pa. at 288–90, 877 A.2d at 391–92 (footnote omitted). The Supreme

Court found that the Gaming Act did not violate the single purpose and clearly expressed title provisions of article III, section 3, stating:

> in the matter *sub judice*, there is a single unifying subject—the regulation of gaming.... Specifically, HB 2330 sets forth the legislative intent of regulating gaming, creates the Gaming Control Board, establishes policies and procedures for gaming licenses for the installation and operation of slot machines, enacts provisions to assist Pennsylvania's horse racing industry through other gaming, and provides for administration and enforcement of the gaming law, including measures to in-

sure the integrity of the operation of slot machines.

*Id.* at 297, 877 A.2d at 396. Importantly, the final title of the Gaming Act was "The Pennsylvania Race Horse Development and Gaming Act." Thus, the term "Gaming" was included in the title and the regulation of gaming was a "single unifying subject." Unlike in other cases, where the subject in the title is too broad and the act contains too many subjects,[10] in this case the title contains what appears to be a very specific subject—the regulation of debt management services. It is possible that the title was intended to be read broadly, and that with a factual record the Department will show that there was a

---

**10.** *See, e.g., City of Philadelphia v. Commonwealth,* 575 Pa. 542, 838 A.2d 566 (2003). In *City of Philadelphia,* the Pennsylvania Supreme Court considered an act entitled:

> AN ACT Amending Title 53 (Municipalities Generally) of the Pennsylvania Consolidated Statutes, providing for acceptance of gifts or donations; further providing for powers and duties of the Municipal Police Officers' Education and Training Commission; prohibiting political activity by municipal police officers; further providing, in Parking Authorities, for definitions, for purposes and powers and for special provisions for authorities in first class cities; providing, in parking authorities in first class cities, for additional special provisions, for management of authority funds, for special funds, for bonds, for contracts with authority obligees, for Commonwealth pledges, for bond and trust indentures, for funds collected, for bonds as legal investments, for pledge validity, for security interests in funds and accounts and for bankruptcy limitations; further providing for municipal authority governing bodies and money; providing for regulation of taxicabs and limousines in first class cities; further providing for governing body of municipal authorities and for certain fiscal reporting; codifying the Act of June 27, 1986 (P. L.267, No. 70), known as the Pennsylvania Convention Center Authority Act; defining "expansion or substantial renovation"; further providing for purposes and powers and

for capital and operating budgets; providing for expansion funding; further providing for governing board, for moneys of the authority, for award of contracts, for interests of public officers and for rental tax; making an appropriation; and making repeals.

*Id.* at 551–52, 838 A.2d at 572. The Supreme Court noted that one of the concerns behind article III, Section 3 is to prevent the compilation of unrelated pieces of legislation, each of which could not obtain passage on its own merits, into an omnibus bill with a deceptive title that could then obtain passage by combining the constituencies supporting each individual piece of legislation (a practice known as "logrolling.") *Id.* at 574, 838 A.2d at 586. The Supreme Court held that while it was not inappropriate for a reviewing court to read the topic of a bill reasonably broadly so as not to " 'exercise a pedantic tyranny' over the efforts of the Legislature.... There must be limits, however, as otherwise, virtually all legislation, no matter how diverse in substance, would meet the single-subject requirement." *Id.* at 578, 838 A.2d at 588 (quoting *Estate of Rochez,* 511 Pa. 620, 626, 515 A.2d 899, 902 (1986)). The Court held that the act at issue in *City of Philadelphia* fell afoul of article III, Section 3 because it contained "voluminous and varying provisions: many are substantial, most appeared at the last minute, and *some are only hinted at in the title in the vaguest of terms* (e.g., "making repeals"), if at all." *Id.* at 579, 838 A.2d at 589 (emphasis added).

"single unifying subject" and that there was no deception. However, Challengers have alleged that they were actually deceived, and that there are significant differences between the provision of debt settlement services and debt management services. Therefore, at this early stage, we can not say with certainty that Act 117's title, read broadly, indicates a Legislative intent to regulate the area of all debt services sufficient to encompass debt settlement services, as well as debt management services. We, therefore, overrule the Department's Preliminary Objection in the nature of a demurrer as to Challenger's allegation that Act 117 violates article III, section 3 of the Pennsylvania Constitution.

## V. Equal Protection

■ Next, we turn to the Department's Preliminary Objection in the nature of a demurrer as to whether Act 117 violates Challengers' rights to equal protection under the United States and Pennsylvania constitutions. Where a statute does not implicate a suspect classification, an equal protection challenge to that statute will be subject to the rational basis test under which this Court will consider: "1) whether there exists any legitimate state interest; and 2) whether the statute is reasonably related to promoting a legitimate state interest." *Paz v. Pennsylvania Housing Finance Agency*, 722 A.2d 762, 766 (Pa.Cmwlth.1999). It is Challengers' burden to show that the law in question serves no legitimate state interest. *Donato v. State Board of Funeral Directors*, 168 Pa.Cmwlth. 177, 649 A.2d 207, 209 (1994). A challenged "law need only be rational and not arbitrary." *Pennsylvania Funeral Directors Association v. State Board of Funeral Directors*, 90 Pa.Cmwlth. 175, 494 A.2d 67, 71–72 n. 5 (1985). A statute that discriminates on the basis of a non-suspect classification must be upheld "if any state of facts reasonably can be conceived to sustain it" and a "reviewing court is free to hypothesize reasons the legislature might have had for the classification." *Harrisburg School District v. Zogby*, 574 Pa. 121, 137–38, 828 A.2d 1079, 1088–89 (2003). Additionally, "[t]he fact that a classification may be underinclusive ... does not invalidate the statute since the legislature is not constitutionally required to eradicate an entire problem, but may proceed on a piecemeal basis." *Donato*, 649 A.2d at 210.

■ At this preliminary stage, we have only Challengers' factual allegations before us. The most troubling of Challengers' equal protection arguments is that Section 15 appears to allow DSS Providers to charge their clients only an initial $50 consultation fee, while it allows DMS Providers to charge a number of other fees. Section 15(a) states: "[a] licensee may charge a fee of not more than $50 for an initial consultation with a consumer, provided that the consultation includes a consumer education program." 63 P.S. § 2415(a). Section 15(h) provides that "[a] licensee shall not charge a consumer any fees other than those described in this section or by regulation promulgated by the [D]epartment for services regulated pursuant to this act." 63 P.S. § 2415(h). While other subsections of Section 15 permit licensees to charge for debt management services, these subsections do not explicitly permit fees for debt settlement services. Therefore, Challengers allege that, under Act 117, DSS Providers would be limited to charging the initial $50 consultation fee, per Section 15(a), and the actual cost of pulling a client's credit report, per Section 15(d). Challengers allege that this would have a severe impact on the business models of many DSS Providers.

The Department, in its main brief, does not advance a state interest that is fur-

thered by this difference in treatment between DSS and DMS Providers, beyond stating:

> [Challengers] allege significant differences between the two consumer debt business models that are regulated by Act 117. Given this alleged difference, *and the public testimony that raised significant concerns with [Challengers'] business model on the consumers in the Commonwealth,* the General Assembly's enactment of Act 117 is rational and does not violate equal protection.

(Department's Br. at 20 (emphasis added).) This language implies that differences in the way in which DMS and DSS Providers conduct their businesses may justify the much more onerous fee restrictions on DSS Providers. In its Reply Brief, the Department articulates the purpose behind its regulation of DSS Providers as an "interest in regulating the consumer debt relief industry, including debt settlement providers, to protect Pennsylvania consumers in financial distress from potentially fraudulent and unscrupulous practices." (Department's Reply Br. at 11.) Prevention of fraud and abusive business practices does constitute a legitimate state purpose.

The question is whether we can decide at this preliminary stage whether the fee provisions of Section 5 are rationally related to this purpose. The Department attached, as an exhibit to its brief, transcripts of testimony before the House Commerce Committee that appears to indict both debt management services and debt settlement services business models as being potentially harmful to consumers. However, such transcripts at this stage do not provide a factual basis in the record to conclude that the Legislature considered the differences between the two business models and intended the difference in permitted fees to further the purpose of protecting consumers. Moreover, at this point, the Department has not articulated, and this Court has been unable to hypothesize, a mechanism whereby the differences in fees permitted to DMS and DSS Providers by Section 5 furthers the purpose of protecting consumers from fraud and abusive business practices given the factual averments before us.

■ Challengers' second equal protection argument is that DMS Providers will be allowed to continue doing business pending the promulgation of licensing regulations, pursuant to Section 20's transition provisions,[11] while DSS Providers will not. In response, the Department correctly points out that, because only non-profit DMS Providers were allowed to operate prior to the enactment of Act 117, it is only non-profit DMS Providers who will be allowed to continue doing business pending approval of their licenses pursuant to Section 20 of Act 117. Thus, the issue we must address is whether there is a rational relationship between the licensing requirement of Section 3(b), which requires DSS Providers to comply with regulations that do not yet exist[12] in order to obtain a license, effectively forbidding DSS Provid-

---

**11.** Section 20 of Act 117 provides that:

A person that provides debt management services before the effective date of this section, that is not then acting in violation of 18 Pa.C.S. § 7312 (relating to debt pooling) and that seeks to continue providing such services must submit an application for a license under this act within 45 days of the effective date of this section. The applicant may continue to provide debt management services provisionally, according to the requirements of this act, while the department processes the application for licensure.

63 P.S. § 2420.

**12.** And, as pointed out above, the Legislature has provided no guidance or restraint to the Department in the promulgation of such regulations.

ers to operate in Pennsylvania until the Department promulgates such regulations, and the Legislature's purpose in consumer protection. Again, at this preliminary stage we do not have a reasonable explanation from the Department for this difference in treatment between DSS Providers and non-profit DMS Providers. For these reasons, this Court overrules the Department's Preliminary Objection in the nature of a demurrer with regard to Challengers' equal protection claims.

## VI. Due Process

■■■ Next, we turn to the Department's Preliminary Objection in the nature of a demurrer to Challengers' argument that Act 117, by preventing DSS Providers from doing business in Pennsylvania until the Department promulgates regulations, infringes on Challengers' due process rights under the Pennsylvania and United States Constitutions. Challengers argue that article I, § 1[13] of the Pennsylvania Constitution, as well as the Fourteenth Amendment of the United States Constitution, affords persons certain inalienable rights such as "the right to pursue a lawful occupation." *Nixon v. Department of Public Welfare*, 576 Pa. 385, 401, 839 A.2d 277, 288 (2003). Therefore, Challengers argue, by preventing DSS Providers from pursuing an occupation as DSS Providers, Act 117 infringes on an important right and should be subject to a higher standard than the rational basis test. Although the right to pursue a lawful occupation is a right, "[t]he right to engage in a particular occupation, however, is not a fundamental right." *Nixon*, 576 Pa. at 401–02, 839 A.2d at 288. Therefore, the provisions of Act 117 are subject to a rational basis test.

For the reasons stated in the discussion of Challengers' equal protection claim, this Court does not believe that the Department has, so far, marshaled arguments convincing this Court that Act 117 meets the rational basis test with respect to DSS Providers. Therefore, we must overrule the Department's Preliminary Objection in the nature of a demurrer to Challengers' due process claim.

## VIII. Contracts Clause

■■■■ Next, we consider Challengers' arguments that Act 117 violates the Contracts Clauses of the United States and Pennsylvania Constitutions. Article I, Section 10 of the United States Constitution states:

> No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, *or Law impairing the Obligation of Contracts*, or grant any Title of Nobility.

U.S. Const. Art. I, § 10, cl. 1 (emphasis added). Article I, section 17 of the Pennsylvania Constitution provides that "[n]o *ex post facto* law, **nor any law impairing the obligation of contracts,** or making irrevocable any grant of special privileges or immunities, shall be passed." Pa. Const. art. I, § 17 (boldface emphasis added). In order to succeed on their impairment of contracts claim, Challengers would have "to demonstrate that a change in state law has operated as a substantial impairment of a contractual relationship." *South Union Township v. Department of Environmental Protection*, 839 A.2d 1179,

---

**13.** This section provides that:

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Pa. Const. art. I, § 1.

1188 (Pa.Cmwlth.2003) (citing *General Motors Corp. v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992)). In determining whether Challengers have met this burden, this Court should look at three elements: (1) "whether there is a contractual relationship"; (2) "whether a change in law impairs that contractual relationship"; and (3) "whether the impairment is substantial." *Romein,* 503 U.S. at 186, 112 S.Ct. 1105. The Department bases much of its argument regarding this issue on the premise that the second element of this test would be met because "Act 117 clearly provides that it only applies to contracts executed into [sic] after its effective date." (Department's Br. at 15.) Presumably, the Department is referring to Section 48 of Act 117, which states:

The provisions of this act shall apply to:

(1) Any debt management services agreement or debt settlement services agreement which is:

(i) negotiated, offered or otherwise transacted within this Commonwealth, in whole or in part, whether by the licensee or any other person;

(ii) made or executed within this Commonwealth after the effective date of this act; or

(iii) notwithstanding the place of execution, entered into with a resident of this Commonwealth.

(2) Any person who engages in debt management services or debt settlement services in this Commonwealth.

63 P.S. § 2448. The Department's argument in this regard apparently relies on Section 48(1)(ii), which provides that Act 117 applies to contracts executed after the effective date of the Act, and on the inference that Act 117 does not, therefore, apply to contracts entered into prior to Act 117's effective date. On its face, however, the elements of Section 48(1) are disjunctive, and therefore, even a DSS agreement entered into prior to the effective date of Act 117 could fall within the purview of Act 117 if it were entered into with a Commonwealth resident or negotiated or contracted within the Commonwealth. Moreover, Section 48(2) appears to stand on its own and does not appear to be contingent on the provisions of Section 48(1) being met in order to apply the provisions of Act 117 to any person engaging in DSS. Therefore, because we must assume as true Challengers' allegations that they have existing contracts in Pennsylvania,[14] The licensure requirement of Section 3(b) could prohibit DSS Providers from providing any debt settlement services under existing contracts, which could substantially impair such contracts. Therefore, it is possible that the three-part test of *Romein* could be met.

■ The Department argues that, even if these elements are met, Act 117 should be upheld if the impairment of the DSS Providers' contracts is outweighed by the public good achieved by Act 117. The United States Supreme Court has stated that, "[a]lthough the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves Group v. Kansas Power and Light Company,* 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (quoting *Home Building & Loan Association v. Blaisdell,* 290 U.S. 398, 434, 54 S.Ct. 231, 78 L.Ed. 413 (1934)). Where, as here, a government regulation substantially impairs a contract:

the State, in justification, must have a significant and legitimate public purpose behind the regulation, such as the reme-

---

**14.** Challengers have pleaded that they do have contracts with Pennsylvania residents and residents of other states. (Petition ¶¶ 79–80.)

dying of a broad and general social or economic problem. Furthermore ... the Court has indicated that the public purpose need not be addressed to an emergency or temporary situation.... The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests.

Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption."

*Id.* at 411–12, 54 S.Ct. 231 (citations omitted) (footnote omitted) (quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)). As discussed above, the Legislature's desire to protect economically vulnerable consumers from predatory debt services is a legitimate, even significant state purpose. However, because of the preliminary stage of this litigation, as in our discussion of previous issues dealing with equal protection and substantive due process, there has been no evidence to support a rational relationship between the cessation of Challengers' business pending a lengthy rulemaking process and the protection of the public. This Court, therefore, overrules the Department's Preliminary Objection in the nature of a demurrer to Challengers' claims that Act 117 violates the Contracts Clauses of the United States and Pennsylvania Constitutions.

### IX. Conclusion

As we have emphasized, our opinion does not question the importance of protecting the public from predatory practices, nor does it determine who will ultimately be successful. However, for the foregoing reasons, we must sustain the Department's Preliminary Objections as to the argument that Challengers' claims under the United States Constitution are brought pursuant to Section 1983 and overrule the remainder of the Department's Preliminary Objections.

### *ORDER*

**NOW,** July 24, 2009, Preliminary Objection I [15] of the Department of Banking in the above-captioned matter is hereby **SUSTAINED.** The remainder of the Department of Banking's Preliminary Objections in the above-captioned matter are hereby **OVERRULED.** An answer is due in 30 days from the date of entry of this order.

DISSENTING OPINION BY Judge SMITH–RIBNER.

Respectfully, I dissent from the decision that this case should proceed when it is evident that the issues are not ripe for review because the Department of Banking has not yet promulgated regulations to implement the Debt Management Services Act, Act of October 9, 2008, No. 117, 63 P.S. §§ 2401–2449 (Act 117). The majority observes that the protection of "economically vulnerable consumers from predatory debt services is a legitimate, even significant state purpose," op. at 1279. It nevertheless overrules, among others, the Department's preliminary objection in the nature of a demurrer to Petitioners' claim that Act 117 represents an unconstitutional delegation of legislative authority in regard to Debt Settlement Services (DSS) Providers in violation of Article II, Section 1 of the Pennsylvania Constitution. I disagree with the conclusion that Act 117 provides no guidance or imposes no restraints on the Department with regard to regulating DSS Providers.

---

**15.** Relating to 42 U.S.C. § 1983.

As the Department emphasizes in its brief, the legislature made the required basic policy choices and provided through the Act adequate standards to guide and to restrain the Department in exercising its delegated functions, citing among other cases *Christ the King Manor v. Commonwealth, Department of Public Welfare*, 911 A.2d 624 (Pa.Cmwlth.2006), for the principle that the Court should examine the underlying purpose of legislation and its reasonable effect in ruling on whether the non-delegation doctrine has been violated.

In *Christ the King Manor* the Court rejected the petitioners' Article II, Section 1 non-delegation claim that the legislature failed to make basic policy choices and to establish adequate standards to guide the Department of Public Welfare (DPW) in the exercise of its delegated administrative function. The Court sustained DPW's demurrer to the petitioners' amended petition for review challenging the validity of DPW's amendments to its cost adjustment regulations related to nursing facility payment rates under the state's medical assistance program. The petitioners sought a declaration that the regulations were invalid due to the alleged unconstitutional delegation of authority. After reviewing the state's Welfare Code and the federal Medicaid Act, the Court held that adequate legislative standards were provided for DPW to perform its delegated administrative function of setting medical assistance nursing facility payment rates even before as well as after Act 42 (Act of July 7, 2005, P.L. 177), which allowed DPW to amend its rate-setting methodology for facilities participating in the program. The Court noted a basic policy of the Medicaid Act: to ensure continued access to facilities for those who need medical assistance by providing reasonable and adequate payments to economically and efficiently operated facilities. It then held that Act 42 was consistent with the federal act and that DPW adopted the challenged amendments

pursuant to Act 42. Accordingly, the standards in the Welfare Code and the federal act were adequate to guide and restrain DPW's discretion in establishing the payment methodology.

Here, the Department points out the basic policy choices made by the legislature, which are no less adequate than those noted in *Christ the King Manor*. Act 117 requires licensure for debt management and for debt settlement businesses and provides the information required for licensure and for the revocation of licenses. Act 117 provides reporting requirements for licensed businesses in both categories, and it provides standards regarding conflict of interest and prohibitions against the purchase of consumer debts, distribution of misleading or false information, disclosure of client identity and so forth. Act 117 forbids a licensee from compromising a consumer debt unless the compromise benefits the consumer and has been approved in writing by the consumer. In addition, the Department points out that it is responsible, among other things, for licensing, holding administrative hearings, prohibiting those who violate Act 117 from engaging in activities that are regulated by the Department and ordering Act 117 violators to make restitution to consumers or to make refunds of fees collected. By no means can it be fairly said that these provisions do not represent basic legislative policy choices and provide adequate standards to guide the Department in performing its administrative duty to promulgate regulations to implement Act 117.

There has been no violation of the non-delegation clause of Article II, Section 1 of the Constitution, and because the Department has not yet promulgated regulations to implement Act 117 I urge that this matter is not ripe for review and that the Department's demurrer be sustained and Petitioners' action be dismissed. In *Amer-*

*ican Council of Life Ins. v. Foster,* 134 Pa.Cmwlth. 634, 580 A.2d 448 (1990), the petitioners challenged an insurance commissioner order denying a petition for investigation and declaratory order related to the commissioner's elimination of a gender-based classification from life and health lines of insurance. They also filed a declaratory judgment complaint requesting that this Court issue a ruling that the commissioner had no authority to prohibit the insurance industry's use of gender in underwriting and pricing life and health insurance.

The commissioner filed a preliminary objection in the nature of a demurrer to the complaint in *American Council of Life Ins.,* contending that this Court lacked jurisdiction because no present case or controversy existed inasmuch as proposed regulations had not been promulgated and the petitioners had to present their concerns through the rulemaking process and then administrative review through the insurance department. The Court sustained the demurrer because the proposed unisex regulations had not been formally promulgated, and therefore an actual controversy did not exist. In short, judicial intervention was premature where the issues involved were to be resolved in the rulemaking process, which would allow the petitioners an opportunity to provide input through written comment and to appear at hearings during the rulemaking process.

The Court noted that the petitioners were not prejudiced because they did not have to rewrite policies or adjust rates until regulations had been formally adopted. It adopted the rationale expressed in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), that administrative agencies should be protected from judicial interference until an administrative decision has been formalized and its effects felt in concrete ways. The reasoning in *American Council of Life Ins.* applies equally here. No regulations exist yet, and because the DSS Providers are not precluded from servicing their existing clients they will not be prejudiced by waiting until an actual case or controversy exists.

The Department's demurrer tests the legal sufficiency of the petition for review filed in this case, and under its present state the Department's demurrer should be sustained. *Christ the King Manor.* Act 117 became effective only on February 6, 2009, and until the Department has proceeded through the regulatory process and formally adopted regulations, no case or controversy exists. As a consequence, the Court has no jurisdiction and should proceed no further in this matter.