IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mary Ann Protz,                          :
                          Petitioner     :
                                         :
            v.                           :
                                         :
Workers' Compensation Appeal             :
Board (Derry Area School District),      :   No. 1024 C.D. 2014
                          Respondent :        Argued: April 15, 2015


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
           HONORABLE BERNARD L. McGINLEY, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE MARY HANNAH LEAVITT, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge


OPINION BY
PRESIDENT JUDGE PELLEGRINI                    FILED: September 18, 2015


            Mary Ann Protz (Claimant) petitions for review of the order of the

Workers' Compensation Appeal Board (Board) affirming the decision of the

Workers' Compensation Judge (WCJ) which granted Derry Area School District's

(Employer) petition to modify Claimant's benefits (modification petition) from

total to partial disability under Section 306(a.2) of the Workers' Compensation Act

(Act).[1]  Because we find Section 306(a.2) of the Act unconstitutional pursuant to

_____

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §511.2, added by the Act of June 24,
1996, P.L 350.

Article II, Section 1 of the Pennsylvania Constitution, we vacate and remand for further proceedings.

## I.

The following facts are not in dispute. In April 2007, Claimant sustained a work injury to her right knee when she fell while working for Employer, and Employer issued a notice of temporary compensation payable. When Claimant returned to work in August 2007, her benefits were suspended pursuant to Employer's notice of suspension. In February 2008, Claimant's work injury recurred, and her benefits were reinstated as per a supplemental agreement.

Subsequently, Employer filed a request for designation of a physician to perform an impairment rating evaluation (IRE), following which Jeffrey M. Moldovan, D.O. evaluated Claimant in October 2011 and provided a ten-percent impairment rating under the Sixth Edition of the American Medical Association's (AMA) *Guides to the Evaluation of Permanent Impairment* (*Guides*).[2] In April 2012, Employer filed a modification petition, seeking to convert Claimant's total disability benefits to partial disability benefits thereby reducing the amount of

---

[2] Dr. Moldovan previously evaluated Claimant in December 2009, but could not perform an IRE as Claimant had not yet obtained maximum medical improvement from her work injury. Following the second IRE, in November 2011, Employer issued a notice of change of workers' compensation disability status, changing Claimant's status from total to partial disability, effective the date of Dr. Moldovan's IRE. Claimant then filed a petition to review compensation benefits, alleging an incorrect description of her work injury and challenging Employer's unilateral conversion of her total disability benefits. The WCJ issued an order finding that Employer was not entitled to automatically convert Claimant's total disability benefits to partial disability benefits and setting aside Employer's notice of change of workers' compensation disability status.

2

compensation that can be paid to 500 weeks. *See* Section 306(a.2)(7) of the Act, 77 P.S. §511.2(7) ("In no event shall the total number of weeks of partial disability exceed five hundred weeks for any injury or recurrence thereof, regardless of the changes in status in disability that may occur….").

A claimant is partially disabled if he or she has a total impairment rating of less than fifty percent. *See* Section 306(a.2)(2) of the Act, 77 P.S. §511.2(2). The impairment rating is determined pursuant to Section 306(a.2) of the Act, providing that it shall be determined under "the most recent edition of the American Medical Association 'Guides to the Evaluation of Permanent Impairment,'" which provide a percent of impairment for each particular injury.[3]

---

[3] Section 306(a.2) of the Act provides:

> (1) When an employe has received total disability compensation pursuant to clause (a) for a period of one hundred four weeks, unless otherwise agreed to, the employe shall be required to submit to a medical examination which shall be requested by the insurer within sixty days upon the expiration of the one hundred four weeks to determine the degree of impairment due to the compensable injury, if any. **The degree of impairment shall be determined** based upon an evaluation by a physician who is licensed in this Commonwealth, who is certified by an American Board of Medical Specialties approved board or its osteopathic equivalent and who is active in clinical practice for at least twenty hours per week, chosen by agreement of the parties, or as designated by the department, **pursuant to the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment."**
>
> (2) If such determination results in an impairment rating that meets a threshold impairment rating that is equal to or greater than fifty per centum impairment **under the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment,"** the employe shall be presumed to be totally disabled and shall continue to receive total disability

**(Footnote continued on next page…)**

3

**(continued…)**

compensation benefits under clause (a). If such determination results in an impairment rating less than fifty per centum impairment **under the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment,"** the employe shall then receive partial disability benefits under clause (b): Provided, however, That no reduction shall be made until sixty days' notice of modification is given.

(3) Unless otherwise adjudicated or agreed to based upon a determination of earning power under clause (b)(2), the amount of compensation shall not be affected as a result of the change in disability status and shall remain the same. An insurer or employe may, at any time prior to or during the five hundred-week period of partial disability, show that the employe's earning power has changed.

(4) An employe may appeal the change to partial disability at any time during the five hundred-week period of partial disability; Provided, That there is a determination that the employe meets the threshold impairment rating that is equal to or greater than fifty per centum impairment **under the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment."**

(5) Total disability shall continue until it is adjudicated or agreed under clause (b) that total disability has ceased or the employe's condition improves to an impairment rating that is less than fifty per centum of the degree of impairment defined **under the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment."**

(6) Upon request of the insurer, the employe shall submit to an independent medical examination in accordance with the provisions of section 314 to determine the status of impairment: Provided, however, That for purposes of this clause, the employe shall not be required to submit to more than two independent medical examinations under this clause during a twelve-month period.

(7) In no event shall the total number of weeks of partial disability exceed five hundred weeks for any injury or recurrence thereof, regardless of the changes in status in disability that may occur. In no event shall the total number of weeks of total disability exceed

**(Footnote continued on next page…)**

When the Act was enacted, the Fourth Edition of the American Medical Association (AMA) *Guides to the Evaluation of Permanent Impairment* (*Guides*) was in effect but at the time of Claimant's examination, the most current version (the Sixth Edition) was being used. Each edition can change the impairment rating for the same injury.

Following a hearing,[4] the WCJ determined that as of January 16, 2012, Claimant's impairment rating was less than fifty percent under the Sixth

**(continued…)**

> one hundred four weeks for any employe who does not meet a threshold impairment rating that is equal to or greater than fifty per centum impairment **under the most recent edition of the American Medical Association "Guides to the Evaluation of Permanent Impairment"** for any injury or recurrence thereof.
>
> (8)(i) For purposes of this clause, the term "impairment" shall mean an anatomic or functional abnormality or loss that results from the compensable injury and is reasonably presumed to be permanent.
>
> (ii) For purposes of this clause, the term "impairment rating" shall mean the percentage of permanent impairment of the whole body resulting from the compensable injury. The percentage rating for impairment under this clause shall represent only that impairment that is the result of the compensable injury and not for any preexisting work-related or nonwork-related impairment.

77 P.S. §511.2 (emphasis added).

[4] Because Claimant does not challenge the WCJ's factual findings, we need not summarize the testimony presented to the WCJ.

Edition of the *Guides*. Accordingly, the WCJ granted Employer's modification petition, finding that Claimant was entitled only to partial disability benefits.[5]

## II.

Claimant appealed to the Board, asserting that Section 306(a.2) of the Act, 77 P.S. §511.2, constitutes an "unconstitutional delegation of authority by the state legislature." (Claimant's Appeal from WCJ's Findings of Fact and Conclusions of Law, at 1.) The Board affirmed the WCJ's decision, finding that:

> The constitutionality of Section 306(a.2), 77 P.S. §511.2, was addressed by the Commonwealth Court in *Johnson v. [Workers' Compensation Appeal Board] (Sealy Components Group)*, 982 A.2d 1253 (Pa. Cmwlth. 2009)[, *appeal denied*, 996 A.2d 493 (Pa. 2010)], where it found a claimant's constitutional rights to due process were not violated. The Commonwealth Court further upheld Section 306(a.2) where it required the use of the [S]ixth [E]dition of the Guides despite a regulation allowing for a grace period. *Stanish v. [Workers' Compensation Appeal Board] (James J. Anderson Constr[uction] Co.)*, 11 A.3d 569 (Pa. Cmwlth. 2010). Furthermore, the Commonwealth Court held up Section 306 as an example of a constitutional delegation of power in *P[ennsylvania] Builders Ass[ociation] v. Dep[artment] of Labor & Indus[try]*, 4 A.3d 215 (Pa. Cmwlth. 2010) [(*en banc*)].

(Reproduced Record [R.R.] at 72a.) This appeal followed.[6]

---

[5] The WCJ further granted Claimant's review petition and amended the description of her injury.

6

**III.**

On appeal,[7] Claimant challenges the constitutionality of Section 306(a.2) of the Act, 77 P.S. §511.2, as an unconstitutional delegation of legislative authority pursuant to Article II, Section 1 of the Pennsylvania Constitution.[8] She contends that this provision gives the AMA rather than the General Assembly

**(continued…)**

[6] We review Board decisions to determine whether errors of law were made, whether constitutional rights were violated, and whether necessary findings of fact are supported by substantial evidence. *Ward v. Workers' Compensation Appeal Board (City of Philadelphia)*, 966 A.2d 1159, 1162 n.4 (Pa. Cmwlth.), *appeal denied*, 982 A.2d 1229 (Pa. 2009). As we explained in *Association of Settlement Companies v. Department of Banking*, legislative enactments enjoy a strong presumption that they do not violate the Constitution. 977 A.2d 1257, 1261 (Pa. Cmwlth. 2009) (*en banc*).

[7] At the outset, Employer asserts that Claimant waived her right to argue that Section 306(a.2) of the Act is an unconstitutional delegation of authority since that argument is premised upon Article II, Section 1 of the Pennsylvania Constitution, a provision that was raised for the first time before this Court. While Claimant did cite only Article III, Section 1 in her appeal before the Board and in her petition for review, there can be no doubt regarding the nature of her argument below. *See* Pa. R.A.P. 1513(d)(5) (stating that the petition for review shall contain "a general statement of the objections to the order or other determination, but the omission of an issue from the statement shall not be the basis for a finding of waiver if the court is able to address the issue based on the certified record"). Indeed, although she may have cited the wrong constitutional provision, the Board was clearly able to discern and address her argument, as are we. (*See* R.R. at 72a ("Claimant does not challenge or appeal the specific factual findings or legal conclusions of the WCJ other than to argue that Section 306 is an unconstitutional delegation of legislative authority.")). Moreover, "[q]uestions involving the validity of a statute" may be raised before this Court even if they were not raised before the administrative agency below. Pa. R.A.P. 1551(a)(1); *see also* Section 703 of the Administrative Agency Law, 2 Pa. C.S. §703 ("A party who proceeded before a Commonwealth agency under the terms of a particular statute shall not be precluded from questioning the validity of the statute in the appeal…"). Therefore, we will proceed to address the merits of Claimant's appeal.

[8] Article II, Section 1 states, "The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." Pa. Const. art. II, § 1.

7

authority to establish the criteria under which a claimant is adjudicated partially or totally disabled.

By way of background, Claimant asserts that Section 306(a.2) was added to the Act in 1996, at which time IREs were performed pursuant to the Fourth Edition of the AMA *Guides*. She claims that the AMA *Guides* have undergone two revisions since that time and that the current (Sixth) Edition provides substantially different standards than those set forth in the Fourth Edition, thereby causing some claimants who would have been considered more than fifty percent impaired under the Fourth Edition to be less than fifty percent impaired under the Sixth Edition.

Employer, echoing the Board's reasoning, initially contends that we have already addressed this issue and decided that Section 306(a.2) does not constitute an unlawful delegation in both *Stanish v. Workers' Compensation Appeal Board (James J. Anderson Construction Co.)*, 11 A.3d 569 (Pa. Cmwlth. 2010) and *Wingrove v. Workers' Compensation Appeal Board (Allegheny Energy)*, 83 A.3d 270 (Pa. Cmwlth.), *appeal denied*, 94 A.3d 1011 (Pa. 2014).

In *Stanish*, a claimant challenged an April 2008 IRE performed pursuant to the Fifth Edition of the *Guides*, claiming that the physician's calculations should have been made under the more recent Sixth Edition, published in January 2008. 11 A.3d at 572. However, the employer relied on a Bureau of Workers' Compensation (Bureau) regulation stating that the Bureau would accept IREs performed under either the Fifth or Sixth Edition until August 31, 2008, to

8

allow physicians time to attend an approved training course on the Sixth Edition. *Id.* The Board affirmed the WCJ's decision holding that as per the Bureau's regulation, physicians were not required to use the Sixth Edition of the *Guides* until September 2008. *Id.*

On appeal, we found that the Bureau's regulation allowing for a grace period violated Section 306(a.2)(1)'s mandate that "The degree of impairment shall be determined…pursuant to the most recent edition of the American Medical Association 'Guides to the Evaluation of Permanent Impairment.'" *Id.* at 573 (quoting Section 306(a.2)(1) of the Act, 77 P.S. §511.2). We explained that the term "shall" is mandatory and that although the Bureau's interpretation of this provision may be reasonable, it contradicts the statute's plain language. *Id.* at 576. Importantly, we specifically stated that neither party in that case challenged Section 306(a.2) of the Act as an unconstitutional delegation of legislative power under Article II, Section 1 of the Pennsylvania Constitution:

> Neither party raises any constitutional argument concerning whether the Legislature's use of the phrase "the degree of impairment shall be determined based upon an evaluation by a physician ... pursuant to the most recent edition of the American Medical Association 'Guides to the Evaluation of Permanent Impairment'" gives rise to any impermissible delegation of any law making power to the AMA when it issues a new text. Thus, we will not pursue this issue any further.

*Id.* at 573 n.2.

9

In *Wingrove,* a claimant challenged the constitutionality of Section 306(a.2) of the Act when his status was changed from totally to partially disability following an IRE performed in accordance with the Sixth Edition of the *Guides*. 83 A.3d at 276. Specifically, the claimant asserted that "in some circumstances, a claimant who would have been considered to be more than 50% disabled under the most recent [Fourth] edition of the AMAs in 1996, might be less than 50% disabled under the most recent [Sixth] edition today," and that "a different claimant with a different type of injury, who was less than 50% disabled in 1996, might be considered to be more than 50% under the most recent edition today." *Id.* (citing Claimant's Brief, at 18) (internal quotations omitted).

We determined that in *Wingrove*, the claimant failed to develop his constitutional argument, explaining that "[a]lthough he asserts that different editions of the AMA Impairment Guidelines may change a claimant's impairment evaluation, he does not assert that any of these changes would have affected his 2005 IRE." *Id.* at 277. Further, we discussed several of the difficulties in addressing a claim that Section 306(a.2) of the Act was an unconstitutional delegation of legislative authority to the AMA, finding that the claimant had addressed none of the pertinent issues and therefore failed to develop his argument to the point that he established a plain and palpable constitutional violation. *Id.*

## IV.

Article II, Section 1 of the Pennsylvania Constitution vests legislative power in our General Assembly, "embod[ying] the fundamental concept that only the General Assembly may make laws, and cannot constitutionally delegate the

power to make law to any other branch of government or to any other body or authority." *Association of Settlement Companies v. Department of Banking*, 977 A.2d 1257, 1265 (Pa. Cmwlth. 2009) (*en banc*).

As our Supreme Court explained in *Holgate Brothers Co. v. Bashore*:

> Legislative power in Pennsylvania is vested solely in the General Assembly. Regardless of exigencies which at times arise or of how trying our economic or social conditions become, the powers and duties imposed by the Constitution upon the legislative branch of our government remain steadfast and neither the urgency of the necessity at hand nor the gravity of the situation allow the legislature to abdicate, transfer or delegate its authority or duty to another branch of the government. Our system of checks and balances in the government was wisely instituted by the framers of the Constitution for the protection of all the people of the Commonwealth and has proved an effective method to prevent unwise, hasty and imprudent legislation. So effective has been this system of government no attempt has been made to amend that part of the Constitution and it remains the fundamental law of this Commonwealth.

200 A. 672, 675 (Pa. 1938).

Nonetheless, it has been held that the General Assembly may "delegate authority and discretion in connection with the execution and administration of a law" to an independent agency or an executive branch agency where the General Assembly first "establish[es] primary standards and impose[s] upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the enabling legislation." *Blackwell v. Commonwealth,*

11

*State Ethics Commission*, 567 A.2d 630, 637 (Pa. 1989). The limits on delegating such power are twofold: "(1) the basic policy choices must be made by the Legislature"; and (2) the "legislation must contain adequate standards which will guide and restrain the exercise of the delegated administrative functions." *Gilligan v. Pennsylvania Horse Racing Commission*, 422 A.2d 487, 489 (Pa. 1980), *remanded*, 432 A.2d 275 (Pa. Cmwlth. 1981).

In *Bell Telephone Company of Pennsylvania v. Driscoll*, 21 A.2d 912, 915 (Pa. 1941), Bell challenged Section 702 of the Public Utility Law of 1937,[9] which then provided, "No public utility…shall, without the prior approval of the [Public Utility] [C]omission [(PUC)], make effective or modify any contract with an affiliated interest…." *Id.* at 913 n.1. Our Supreme Court noted that this provision contained "no explicit standard…to guide the [PUC]," indicating that "the legislature did not intend to set up any standard for the [PUC] in approving contracts, for its power to approve or disapprove is untrammeled by any conditions." *Id.* at 915.

In rejecting the PUC's contention that "public interest" was the implied standard for approval, the Court explained that unless further defined or limited in its meaning, the term could not serve as a proper standard because to determine whether a contract was contrary to the public interest, it is first "necessary to find what is or what is not in the public interest," and "[t]he power to make such determination rests with the legislature." *Id.* Explaining, "[i]f the

_____

[9] Act of May 28, 1937, P.L. 1053, *as amended*, 66 P.S. § 1272, *repealed and replaced by* the Public Utility Code, 66 Pa. C.S. §§ 101–3316.

legislature fails, however, to prescribe with reasonable clarity the limits of the power delegated or if those limits are too broad its attempt to delegate is a nullity," the Court determined that the General Assembly failed to provide standards for the PUC to employ in approving or disproving contracts. *Id.* at 916.

Similarly, in *Association of Settlement Companies*, this Court adjudicated the Department of Banking's preliminary objections to debt-settlement services providers' petition for review, asserting that then-Section 3(b) of the Debt Management Services Act[10] unconstitutionally delegated the General Assembly's power to regulate debt-settlement service providers' conduct to the Department of Banking. 977 A.2d at 1263. The provision at issue stated, in pertinent part, "No person may…provide debt settlement services to a consumer for a fee unless the person is licensed by the department under this act and is operating in accordance with *regulations promulgated by the department regarding the conduct of debt settlement services.*" Section 3(b) of the Debt Management Services Act, *formerly* 63 P.S. § 2403(b) (emphasis added).

Determining that Section 3(b) "provide[d] the Department with no guidance or restraint regarding the *regulation* of 'the conduct of debt settlement services'" in that it "[wa]s silent on how debt settlement services [we]re to be provided, what an agreement to provide debt settlement services must contain, or any other provisions similar to the ones established for [Debt Management Service] Providers," we found that Section 3(b) lacked intelligible standards to

---

[10] Act of October 9, 2008, P.L. 1421, 63 P.S. §2403(b), *repealed by* Act of July 9, 2014, P.L. 1022.

13

guide the Department of Banking with regard to the activities of debt settlement services providers. *Association of Settlement Companies*, 977 A.2d at 1268–69. We held that in the absence of such standards, we could not find that the General Assembly's delegation of authority to the Department of Banking was legitimate, and therefore overruled the Department's preliminary objections in this regard. *Id.* at 1272.

Employer directs us to *Pennsylvania Builders Association v. Department of Labor & Industry*, 4 A.3d 215 (Pa. Cmwlth. 2010) (*en banc*), a case in which we addressed an association's contention that a provision of the Pennsylvania Construction Code Act[11] was invalid as an unconstitutional delegation of authority by the General Assembly. *Id.* at 219. Pursuant to Section 301(a) of the Pennsylvania Construction Code Act, 35 P.S. § 7210.301(a), the Department of Labor and Industry (Department) was required to promulgate regulations adopting the then-current versions of the National Building Code[12] and the International One- and Two-Family Dwelling Code.[13] *Pennsylvania Builders Association*, 4 A.3d at 218.

Further, Section 304(a) of the Pennsylvania Construction Code Act, 35 P.S. § 7210.304(a), required the Department to promulgate regulations at the

---

[11] Act of November 10, 1999, P.L. 491, *as amended*, 35 P.S. §§ 7210.101–.1103.

[12] Building Officials and Code Administrators International, Inc., National Building Code (14th ed. 1999).

[13] International Code Council, Inc., International One- and Two-Family Dwelling Code (1998 ed.).

14

end of each year in which these codes were modified, adopting or rejecting the changes pursuant to the recommendation of the Uniform Construction Code Review and Advisory Council (Advisory Council), the members of which were appointed by the Governor. *See* Section 107(b)(2) of the Pennsylvania Construction Code Act, *added by* Act of October 9, 2008, P.L. 1386, *as amended*, 35 P.S. § 7210.107(b)(2). Following the issuance of revisions in 2009, the Advisory Council notified the Department that it had no exclusions to recommend, and the Department promulgated regulations adopting the changes. *Pennsylvania Builders Association*, 4 A.3d at 218–19 & n.6; *see also* 39 Pa. Bull. 7196 (December 26, 2009).

In sustaining the Department's preliminary objections to the association's claim that the General Assembly had improperly vested its legislative authority in the International Code Council, we explained:

> [T]o the extent the General Assembly was attempting via the [Pennsylvania Construction Code Act] to delegate its rule-making authority over Pennsylvania's building codes to [the Department] and, consequently [International Code Council], it had the authority to do so as long as, in light of the subject matter covered and the scope of the powers granted therein, the [Pennsylvania Construction Code Act] sets forth a definite and reasonable standard for such authority.

*Pennsylvania Builders Association*, 4 A.3d at 221.

Just as in *Bell Telephone Company of Pennsylvania* and *Association of Settlement Companies*, and unlike in *Pennsylvania Builders Association*, in the

15

instant case, the General Assembly has failed to prescribe *any* intelligible standards to guide the AMA's determination regarding the methodology to be used in grading impairments. Section 306(a.2) of the Act is wholly devoid of any articulations of public policy governing the AMA in this regard and of adequate standards to guide and restrain the AMA's exercise of this delegated determination by which physicians and WCJs are bound. Indeed, Section 306(a.2) merely requires that the most recent version of the AMA *Guides* be used to determine a claimant's impairment rating. 77 P.S. §511.2. Accordingly, under this basis alone, we find Section 306(a.2) of the Act unconstitutional.[14]

Additionally, Section 306(a.2) of the Act lacks a mechanism requiring governmental review of the *Guides* by the promulgation of regulations. In the

---

[14] Judge Simpson's dissenting opinion concludes that the majority "misses the mark… because the General Assembly delegated initial determinations of impairment ratings to impartial, Pennsylvania-licensed, board-certified, clinically active physicians; the AMA does not participate in impairment ratings under the Act." (Dissenting Opinion, at 3.) While it is true that individual physicians must provide impairment ratings, under Section 306(a.2) of the Act, they must apply and are bound by the method prescribed by the AMA. Likewise, a WCJ reviewing a petition to modify benefits based upon an IRE may assess the physician's credibility but is not free to adopt a different methodology. Thus, although "the AMA does not participate in impairment ratings under the Act," it provides the "rules" or "laws" which govern them.

Further, Judge Simpson determines that the General Assembly provided numerous standards regarding the methodology to be used in rendering impairment ratings and states that the most recent edition of the AMA *Guides* is but a part of this guidance. Specifically, he sets forth seven policy decisions the General Assembly made in this regard. (Dissenting Opinion, at 4–5.) However, of the seven policies listed, the first three pertain to *who* makes the impairment ratings, and the next three policies describe *what* must be evaluated. Only the seventh policy, stating that the evaluating physician must proceed in accordance with the most recent edition of the AMA *Guides*, pertains to *how* those ratings are to be calculated, and as stated above, the General Assembly provides absolutely no standards in this regard. The fact that the AMA has professional expertise in this arena is of no consequence.

16

above cases, we examined if there were adequate standards to guide and restrain governmental agencies in carrying out the General Assembly's legislative intent. The challenged delegation here is not to a governmental agency but to a private party—the AMA. While it is well-established that the General Assembly may adopt as its own standards established by specialized groups with intimate factual knowledge of the subject matter, it must make the basic policy choices or provide standards to government agencies charged with adopting regulations to implement the standards established by specialized groups. In *Pennsylvania Builders Association*, the Pennsylvania Construction Code Act required the Department to promulgate regulations by the end of each year in which the subject codes were modified to update the Pennsylvania UCC, and we approved a Department regulation adopting the International Code Council's 2009 codes pursuant to this Act. 4 A.3d at 226. Critically, the Act required the Department to promulgate regulations *each year* the codes were modified and established standards for doing so; it did not merely adopt *all* new codes proactively. *Id.* at 218.

In this case, the General Assembly adopted as its own the methodology enumerated by the AMA at the time it enacted Section 306(a.2)— that is, the methodology contained in the Fourth Edition of the *Guides*. The General Assembly has not reviewed and re-adopted the methodology contained in subsequent editions. Moreover, unlike in *Pennsylvania Builders Association*, where the General Assembly provided for review of the new codes by the Department of Labor and Industry, in this case, any form of review of subsequent editions of the AMA *Guides* is wholly absent, leaving unchecked discretion completely in the hands of a private entity. The legislature has simply provided a

17

private party—the AMA—with carte blanche authority to implement its own policies and standards, proactively adopting those standards, sight unseen.

Even then if we had found that there are adequate standards allowing for a delegation to a governmental agency, Section 306(a.2)(1) would still be unconstitutional because the delegation here was to a private party. Unlike governmental agencies which are supposed to act disinterestedly and only for the public good, that presumption cannot be made with regard to private entities. There is no accountability to the public, either directly through the rulemaking process providing for public input and comment or indirectly through the appointment and confirmation power and the power of the purse.[15] More simply, the keystone behind the prohibition against unlawful delegation is that the General Assembly, not private bodies, enacts laws which the government agencies implement in accordance with the standard given to them in the enactment.[16]

---

[15] In *Carter v. Carter Coal Co.*, the United States Supreme Court struck down a provision of the Bituminous Coal Conservation Act of 1935, 15 U.S.C. §§ 801–827, delegating authority to fix maximum hours of labor and set minimum wages to a portion of the producers and a majority of the miners. 298 U.S. 238, 311, 56 S. Ct. 855, 873 (1936). Although this issue was decided under the due process clause of the Fifth Amendment, the Court's rationale is equally applicable here: "This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Id.*

[16] Employer further relies on *Gima v. Hudson Coal Co.*, 165 A. 850, 851 (Pa. 1933). However, *Gima* has been inferentially overruled because it is at odds with later Supreme Court decisions such as *Bell Telephone Company of Pennsylvania v. Driscoll*, 21 A.2d 912, 915 (Pa. 1941), in that it did not examine whether the challenged provision, Rule 29, Article XII of the Anthracite Mine Law, Act of June 2, 1891, P.L. 176, 52 P.S. § 424, *repealed and replaced by* the Pennsylvania Anthracite Coal Mine Act, Act of November 10, 1965, P.L. 721, 52 P.S. §§ 70-101–1405, contained explicit standards to be applied in promulgating the subject safety rules and only cited cases involving delegation to governmental agencies.

Accordingly, we declare Section 306(a.2) of the Act, 77 P.S. §511.2, an unconstitutional delegation of legislative authority insofar as it proactively approved versions of the AMA *Guides* beyond the Fourth Edition without review. Further, we vacate the Board's decision with respect to Employer's modification petition and remand this matter to the Board with instruction to remand to the WCJ to apply the Fourth Edition of the AMA *Guides* in adjudicating the same.

_____
DAN PELLEGRINI, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mary Ann Protz,                          :
                          Petitioner     :
                                         :
           v.                            :
                                         :
Workers' Compensation Appeal             :
 Board (Derry Area School District),     :
                          Respondent     :   No. 1024 C.D. 2014

O R D E R

AND NOW, this 18<u>th</u> day of <u>September</u>, 2015, upon finding Section 306(a.2) of the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §511.2, added by the Act of June 24, 1996, P.L 350, an unconstitutional delegation of legislative authority insofar as it purports to adopt a new version of the American Medical Association's *Guides to the Evaluation of Permanent Impairment (Guides)*, the order of the Workers' Compensation Appeal Board dated May 22, 2014, in the above-captioned case is vacated. This matter is remanded to the Workers' Compensation Appeal Board with instruction to remand further to the Workers' Compensation Judge to apply the Fourth Edition of the *Guides* in effect when the provision was enacted in adjudicating Derry Area School District's petition to modify benefits.

Jurisdiction relinquished.

_____
DAN PELLEGRINI, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mary Ann Protz, :
                 Petitioner :
                 :
         v. : No. 1024 C.D. 2014
                 : Argued: April 15, 2015
Workers' Compensation Appeal :
Board (Derry Area School District), :
                 Respondent :

BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
                 HONORABLE BERNARD L. McGINLEY, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
                 HONORABLE ROBERT SIMPSON, Judge
                 HONORABLE MARY HANNAH LEAVITT, Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ANNE E. COVEY, Judge

DISSENTING OPINION
BY JUDGE SIMPSON              FILED: September 18, 2015

         I disagree with the Majority's determination that Section 306(a.2) of the Workers' Compensation Act[1] (Act), pertaining to medical examinations and impairment ratings, violates the Pennsylvania Constitution's prohibition against the unlawful delegation of legislative power. As explained below, in Section 306(a.2) the General Assembly delegated initial impairment ratings to an independent, Pennsylvania-licensed, board-certified, clinically-active physician. Further, in situations such as the present case, ultimate impairment ratings are resolved by an impartial workers' compensation judge (WCJ) after a full adjudicative process. Therefore, I respectfully dissent.

---

[1] Act of June 2, 1915, P.L. 736, as amended, added by the Act of June 24, 1996, P.L. 350, 77 P.S. §511.2.

"Legislative enactments enjoy a strong presumption that they do not violate the Constitution." Wingrove v. Workers' Comp. Appeal Bd. (Allegheny Energy), 83 A.3d 270, 276 (Pa. Cmwlth. 2014). "The party challenging a statute's constitutionality has a 'very heavy burden' in overcoming the presumption. The party must show the statute 'clearly, palpably and plainly' violates the Constitution." Id. at 276-77.[2]

Pursuant to the non-delegation doctrine set forth in Article II, Section 1 (Commonwealth's legislative power shall be vested in a General Assembly) and Article III, Section 1 (no law shall be passed except by bill) of the Pennsylvania Constitution, the General Assembly cannot delegate its lawmaking power to any other branch of government, body or authority. Christ the King Manor v. Dep't of Pub. Welfare, 911 A.2d 624 (Pa. Cmwlth. 2006), aff'd, 951 A.2d 255 (Pa. 2008) (citing Ins. Fed. of Pa., Inc. v. Dep't of Ins., 889 A.2d 550 (Pa. 2005)).

---

[2] Here, Claimant argued in her brief: "The subsequent editions of the AMA Guides provide substantially different standards for assessing disability than were set forth in 4th Edition. Thus, in some circumstances, a claimant who would have been considered to be more than 50% disabled under the 4th Edition of the AMA Guides, might be less than 50% disabled under the most recent edition today." Pet'r's Br. at 12. "Likewise, a different claimant with a different type of injury, who was less than 50% disabled in 1996, might be considered to be more than 50% under the most recent edition today." Id.

As the Majority observes, this is the argument raised by the claimant in Wingrove v. Workers' Compensation Appeal Board (Allegheny Energy), 83 A.3d 270 (Pa. Cmwlth. 2014), and found insufficient by this Court to develop a constitutional argument because the claimant did not assert that the AMA's changes to the Guides adversely affected his impairment evaluation. See Protz v. Workers' Comp. Appeal Bd. (Derry Area School District), ___ A.3d ___, (Pa. Cmwlth., No. 1024 C.D. 2014, filed ___), slip. op., at 10. In Wingrove, 83 A.3d at 278, we found the claimant's constitutional argument to be "conclusory at best" and insufficient to establish "a plain and palpable constitutional violation." I would make the same determination here.

Nonetheless, the General Assembly may delegate its rulemaking or policy making authority to an administrative agency as long as the General Assembly makes the basic policy choices and enacts safeguards guiding the agency's exercise of the delegated functions.  Id.

Here, the Majority concludes the General Assembly delegated to the American Medical Association (AMA) the determination regarding the methodology to be used in grading impairments, but failed to provide any intelligible standards to do so.  Respectfully, this conclusion misses the mark.  This is because the General Assembly delegated initial determinations of impairment ratings to impartial, Pennsylvania-licensed, board-certified, clinically active physicians; the AMA does not participate in impairment ratings under the Act.  The General Assembly provided numerous standards to guide impairment rating decisions made by physicians, of which use of the most recent edition of the AMA Guides is but a part.

In enacting Section 306(a.2) of the Act, the General Assembly established the basic policy and provided adequate standards for determining impairment ratings for purposes of modification of total disability status under the Act.  As discussed in Westmoreland Regional Hospital v. Workers' Compensation Appeal Board (Pickford), 29 A.3d 120, 127 (Pa. Cmwlth. 2011), appeal denied, 42 A.3d 295 (Pa. 2012), Section 306(a.2)(1) of the Act provides that after 104 weeks of receiving total disability compensation, a claimant is required to submit to a medical examination for purposes of determining the degree of permanent impairment due to the compensable injury.  77 P.S. §511.2(1).  The impairment

rating must be performed by a board certified physician licensed in the Commonwealth who is active in clinical practice for at least 20 hours per week. Id. The physician must be chosen by agreement of the parties or designated by the Department of Labor and Industry. Id. As we noted in Wingrove, 83 A.3d at 277, "the impairment evaluation is conducted by a physician, not by a textbook."

Further, Section 306(a.2)(2) provides that a claimant who reached maximum medical improvement and has an impairment, due to the work injury, of less than *50 percent* under the most recent edition of the AMA Guides, shall receive partial disability benefits for 500 weeks. 77 P.S. §511.2(2). Section 306(a.2)(3) provides that amount of compensation will not be affected as a result of the change in disability status. 77 P.S. §511.2(3).

In addition, Section 306(a.2)(8)(i) of the Act defines the term "impairment" as "an anatomic or functional abnormality or loss that results from the compensable injury and is reasonably presumed to be permanent." 77 P.S. §511.2(8)(i). Section 306(a.2)(8)(ii) defines the term "impairment rating" as "the percentage of permanent impairment of the whole body resulting from the compensable injury and not for any preexisting work-related or non-work-related impairment." 77 P.S. §511.2(8)(ii).

In light of these provisions, the General Assembly made the following basic policy decisions and safeguards:

1. Impairment ratings are medical determinations made by a currently licensed, currently board-certified physician. Interestingly, no challenge is

made to the methodology of the independent medical board which must certify the physician;

2. The physician must be active in clinical practice, the level of activity being based on a uniform, objective standard of 20 hours per week;

3. The physician is chosen by agreement of the parties or designated by the department. Thus, unlike other expert witnesses who may testify in workers' compensation proceedings, the physician cannot be chosen unilaterally by a party;

4. The physician must evaluate permanent impairment;

5. The physician must evaluate whole body impairment;

6. The physician must evaluate impairment from the compensable injury, rather than from some preexisting work-related or nonwork-related impairment; and

7. The physician must proceed pursuant to a known, uniform, objective and current standard approved by the AMA.

The General Assembly thus decided that in the first instance the determination of degree of impairment should be one made by an independently selected (or agreed-upon), currently certified medical specialist, engaged in current clinical practice, and based on a uniform, objective, current and independent assessment standard. Independence, objectivity, uniformity and current medical knowledge and experience are the hallmarks of the process. See Pickford (AMA Guides require objective clinical evidence before a condition can be rated). More specifically, knowledge of and adherence to prevailing best-practice medical standards, as objectively demonstrated by current licensure and board certification, by current clinical experience, and by use of current AMA guidelines, are key. It is hard to see what other basic policy choices remain to be made.

Given the standards in Section 306(a.2) of the Act for determining an impairment rating for the purposes of establishing total or partial disability status after 104 weeks of compensation, I do not believe that legislative deference to the AMA's professional expertise in periodically updating the complex medical standards in the Guides amounts to an unconstitutional delegation of legislative power. In short, the General Assembly made the basic policy choices and established the standards in Section 306(a.2) of the Act for determining the level of disability status based on the level of impairment resulting from the work injury.

Moreover, the AMA Guides are used by medical professionals across the nation in quantifying an individual's degree of physical impairment not only for workers' compensation purposes, but also in a variety of other cases. As this Court previously observed, "[t]he impairment ratings system was developed by the AMA to quantify the monetary loss caused by a personal injury in an objective way." Pickford, 29 A.3d at 127. "The AMA Guides have been used by states and the federal government for many years to determine eligibility to a variety of workers' compensation and related benefits." Id.

Indeed, other states have adopted and judicially upheld similar workers' compensation provisions requiring the use of the most recent edition of the AMA Guides in evaluating impairment in workers' compensation cases. In Madrid v. St. Joseph Hospital, 122 N.M. 524, 928 P.2d 250 (1996), the New Mexico Supreme Court rejected a similar unconstitutional delegation challenge to the required use of the most recent edition of the AMA Guides. In so doing, the Court reasoned:

20. It is impractical to expect our Legislature to establish standards for evaluating physical impairment in workers' compensation claims. The New Mexico Legislature could have concluded that it lacked the resources to develop independent standards, opting instead to utilize the standards established by a highly respected entity that possessed the expertise for such an undertaking. Prohibiting the Legislature from adopting the standards developed by experts within a rapidly changing medical specialty would obstruct the Workers' Compensation Administration's efforts to provide accurate evaluations of impairment.

21. In addition, new developments in medical science relevant to evaluating impairment demand periodic modifications of the standard adopted by Section 24 [of the New Mexico Workers' Compensation Act, N.M.S.A. 1978 §52-1-24]. The AMA Guide is periodically updated to encompass these new developments. Periodic revisions of the standard will not transform an otherwise constitutional and non-delagatory statutory provision into an unconstitutional delegation of legislative power. Where a standard is periodically updated because of new scientific developments recognized by eminent professionals interested in maintaining high standards in science, the standard may still be adopted by the Legislature.

Madrid, 122 N.M. at 532-33, 928 P.2d at 258-59 (citations omitted).

Here, I would uphold the constitutionality of Section 306(a.2) of the Act for similar reasons. I believe the General Assembly may rely on the medical expertise of the AMA, a well-recognized independent authority, in expressing current, best-practice medical knowledge in the Guides.

Importantly, where, as here, an employer requests an impairment rating more than 60 days following 104 weeks of total disability, the employer

must file a modification petition to have the claimant's disability status changed. <u>Pickford</u>. When an employer files such a petition, the initial impairment rating becomes just an item of evidence in a proceeding where a WCJ ultimately determines impairment. <u>Id.</u> A claimant may introduce his own evidence regarding his degree of impairment to rebut the initial impairment rating. <u>Id.</u> For this additional significant reason, the application of the Act in the present case cannot establish a plain and palpable violation of the non-delegation doctrine. <u>Id.</u>

For the above reasons, I would affirm the order of the Board.

_____
ROBERT SIMPSON, Judge

Judges Leadbetter and Covey join in this dissent.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mary Ann Protz,                   :
              Petitioner     :
                           :
         v.                :
                           :
Workers' Compensation Appeal   :
Board (Derry Area School District),  :   No. 1024 C.D. 2014
               Respondent   :   Argued: April 15, 2015

BEFORE:   HONORABLE DAN PELLEGRINI, President Judge
             HONORABLE BERNARD L. McGINLEY, Judge
             HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
             HONORABLE ROBERT SIMPSON, Judge
             HONORABLE MARY HANNAH LEAVITT, Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge


DISSENTING OPINION
BY JUDGE COVEY             FILED: September 18, 2015

I join in Judge Simpson's dissenting opinion, and write separately to express my additional concerns regarding the Majority's declaration that Section 306(a.2) of the Workers' Compensation Act (Act),[1] mandating the use of the most recent American Medical Association's (AMA) "Guides to the Evaluation of Permanent Impairment," is unconstitutional. I disagree with the Majority's conclusion that, "[e]ven . . . if we had found that there are adequate standards allowing for a delegation to a governmental agency, Section 306(a.2)(1) [of the Act] would still be unconstitutional because the delegation . . . was to a private party[,]" since that conclusion is directly contrary to established precedent. Majority Op. at 18. Instead, I believe the mandated use of the AMA Guides constitutes the

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 511.2, added by Section 4 of the Act of June 24, 1996, P.L 350.

permissible involvement of a private organization in the rule-making process, and thus, Section 306(a.2)(1) is not unconstitutional.

In *Gima v. Hudson Coal Co.*, 165 A. 850 (Pa. 1933), which involved legislation incorporating standards developed by private parties, i.e., explosive manufacturers, the Pennsylvania Supreme Court affirmed the constitutionality of Rule 29 of the Anthracite Mine Law (Law),[2] *formerly* 52 P.S. § 424. Rule 29 of the Law provided: "When high explosives other than gunpowder are used in any mine, the manner of storing, keeping, moving, charging and firing or in any manner using such explosives shall be in accordance with special rules **as furnished by the manufacturers of the same**." *Id*. at 851 n.1 (emphasis added) (quoting 52 P.S. § 424).

> The *Gima* Court approvingly quoted the lower court:
>
> [W]e have had much legislation which does not delegate the power of the General Assembly to make laws, but does delegate to some person or body the power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. . . . As was trenchantly said by Chief Justice Black in *Moers v. City of Reading*, 21 Pa. 188, 202 [1853], in discussing the same constitutional provision: 'Half the statutes in our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that the exercise of such a discretion is the making of the law.'
>
> Both the [Law] and [the] Bituminous Mine Law[][3] are replete with instances of powers granted to mine bosses, mine foremen, mine inspectors, and similar officials who do not legislate, but who are authorized to do certain things and give certain orders which must be obeyed by the miners and their laborers, and violation of which constitutes an offense against the mine laws. The power to establish and

---

[2] Act of June 2, 1891, P.L. 176.
[3] Act of June 9, 1911, P. L. 756, 779.

approve certain rules for the storage, firing, use, etc., of high explosives, is no more a delegation of legislative power than the determination of what places in the mine are safe to work in (rules 5, 34 . . .); the granting of permission to fire a blast, where locked safety lamps are used (rule 11 . . . ); the fixing of the number of persons who may be hoisted or lowered at one time in a mine (rule 17 . . . ); the determination whether a miner is competent to blast coal, etc. (rules 35, 36 . . . ); the fixing of a safe steam pressure (rule 39); and none of these are different in character from the power formerly given the courts to pass upon licenses for the sale of intoxicating liquors, referred to and upheld in the opinion in [*Locke's Appeal*, 72 Pa. 491 (1873)]. In fact, a consideration of these different matters will show how impossible and unscientific it would be for the General Assembly to attempt to enact laws covering in detail all the matters thus wisely provided for. . . .

. . . .

**The General Assembly cannot be expected to enact laws which shall in themselves keep abreast of every advance of science and invention in the explosive line any more than it can of itself determine when a working place is free of gas and fit to work in;** but it has established a means by which such advances can be utilized and made safe in mines, and in rule 29 **it has delegated its power to determine the safe method to store, charge, fire and use such explosives to the manufacturer and the mine owner jointly, knowing that they will not for their own interest err on the side of danger, and has established a method for making known such determination to the miners and laborers who use them by posting and publishing, and has declared that a use of such high explosives contrary to such determination, thus posted and published, is a violation of law. In doing so, the General Assembly has legislated – not the powder manufacturer or coal operator – no legislative power or authority has been delegated to them.**

*Gima*, 165 A. at 852-53 (emphasis added) (quoting *Gima v. Hudson Coal Co.*, 161 A. 903, 907-909 (Pa. Super. 1932)).

The Majority states:

> *Gima* has been inferentially overruled because it is at odds with later Supreme Court decisions such as *Bell Telephone Company of Pennsylvania v. Driscoll*, 21 A.2d 912, 915 (Pa. 1941), in that it did not examine whether the challenged provision, Rule 29, Article XII of the [Law], contained explicit standards to be applied in promulgating the subject safety rules and only cited cases involving delegation to governmental agencies.

Majority Op. at 18-19 n.16.

However, in 1973, more than 30 years after *Driscoll*, our Supreme Court relied on *Gima* to reaffirm the principle that "it is not objectionable that 'many things upon which wise and useful legislation must depend which cannot be known to the law-making power, . . . must, therefore, be a subject of inquiry and determination outside of the halls of legislation.'" *Johnson v. Pa. Hous. Fin. Agency*, 309 A.2d 528, 535 (Pa. 1973) (quoting *Gima*, 165 A. at 851). Thus, although the Supreme Court has, in other cases imposed the "adequate standards" requirement to delegated authority, it has still quoted *Gima* for the principle that the General Assembly is permitted to rely upon outside sources.

In addition, just five years ago, this Court, in its *en banc* decision in *Pennsylvania Builders Association v. Department of Labor and Industry*, 4 A.3d 215 (Pa. Cmwlth. 2010), relied upon *Gima* for the same principle. Thus, I believe that the Majority incorrectly concludes that *Gima* has been "inferentially overruled." Majority Op. at 18 n.16.

Further, I agree with the rationale in *Gima* and *Pennsylvania Builders*, that "[t]he General Assembly cannot be expected to enact laws which shall in themselves keep abreast of every advance of science and invention[,]" and it is unreasonable to impose upon the General Assembly the burden of frequently revisiting legislation to reflect evolving, broadly-accepted changes in the medical

field that are beyond the expertise of the legislative body. *Gima*, 165 A. at 853. Thus, I would conclude that, in accordance with *Pennsylvania Builders* and *Gima,* the involvement of a private organization such as the AMA in the rule-making process is not always fatal, and permit the General Assembly to remedy the constitutional infirmity through the imposition of adequate standards similar to those in *Pennsylvania Builders*.

More importantly, I believe the Majority fails to acknowledge that its opinion directly contradicts and effectively overrules the *en banc Pennsylvania Builders* decision which **explicitly rejected the conclusion reached by the Majority here: The involvement of a private party in the General Assembly's rule-making is always unconstitutional.** In *Pennsylvania Builders*, this Court sustained the Department of Labor and Industry's (L&I) preliminary objections to the Pennsylvania Builders Association's (PBA) petition for review and dismissed PBA's motion for summary relief on the basis that the post-Review and Advisory Council (RAC) Pennsylvania Construction Code Act (PCCA)[4] neither improperly delegated the General Assembly's rule-making authority, nor its authority over the execution and administration of that law. Thus, L&I's adoption of International Code Council's (ICC) 2009 codes as Pennsylvania's 2009 Uniform Construction Code (UCC) did not violate Article II, Section 1 of the Pennsylvania Constitution.[5] There, the Court stated:

---

[4] Act of November 10, 1999, P.L. 491, *as amended*, 35 P.S. §§ 7210.101-1103.

[5] The Majority discusses the *Pennsylvania Builders* decision, but distinguishes it from the instant matter by noting that the *en banc Pennsylvania Builders* Court found that the PCCA set adequate standards for the delegation of rule-making authority. However, the Majority does not distinguish or even acknowledge but rather simply ignores the portion of the *Pennsylvania Builders* opinion that, just five years earlier, explicitly endorsed the validity of a non-governmental body's involvement in the General Assembly's rule-making process, and which **specifically** referenced Section 306(a.2) of the Act as an example of a constitutionally-permissible involvement of a non-governmental body in the General Assembly's rule-making process.

**In other cases cited by Petitioners, rule[-]making by a non-governmental entity was deemed a violation of the Article II, Section 1 non-delegation clause,** *not because, as Petitioners would have this Court believe, it was a delegation to a non-governmental entity***, but because the General Assembly failed to provide adequate standards and limitations to guide that entity's actions.**  That is not the case here.

**The involvement of a non-governmental body in the General Assembly's rule-making process is not new.**  In *Gima v. Hudson Coal Co.*, . . . 165 A. 850 ([Pa.] 1933), the Pennsylvania Supreme Court upheld Rule 29 of the Anthracite Mine Law wherein, rather than providing specific safety standards for the storage and firing of explosives, the General Assembly merely incorporated by reference any rules provided by the manufacturers on those matters since, as the Supreme Court quoted the Superior Court, '[t]he General Assembly cannot be expected to enact laws which shall in themselves keep abreast of every advance of science and invention in the explosive line any more than it can of itself determine when a working place is free of gas and fit to work in . . . .'  *Id.*, . . . at 853.  **Certainly,  in light of the high danger involved with explosives, the General Assembly recognized its limitations of time and knowledge and deferred the drafting of the specifics of the law to a more knowledgeable group.  The same reasoning applies in this case, where, the General Assembly's purposes for the PCCA include the provision of standards for the protection of life, health, property and environment, delegation of the details of the construction code may be better left to ICC, as reviewed by the RAC and adopted by L&I.**

**More recently, in Section 306(a.2) of the [Act], the General Assembly dictated relative to medical examinations conducted in order to determine the extent of permanent impairment that:**

> **[t]he degree of impairment shall be determined based upon an evaluation by a physician who is licensed in this Commonwealth, who is certified by an American Board of Medical Specialties**

AEC - 6

> **approved board or its osteopathic equivalent and who is active in clinical practice for at least twenty hours per week, chosen by agreement of the parties, or as designated by the department, pursuant to *the most recent edition of the American Medical Association 'Guides to the Evaluation of Permanent Impairment.'***
>
> **(Emphasis added). Thus, similar to the use of ICC's codes as a guide for establishing Pennsylvania's UCC, the [AMA] is used as a guide to establish Pennsylvania's impairment ratings.**
>
> **It is clear, in this case, that the General Assembly has properly delegated its rule-making authority, and that it delegated such authority to L&I, with definite and reasonable standards.**

*Pennsylvania Builders*, 4 A.3d at 222-23 (citations and footnote omitted; emphasis added).[6] Accordingly, the Majority's conclusion that a private party's involvement in the rule-making process is unconstitutional directly contradicts the *Pennsylvania Builders* decision.[7]

_____
ANNE E. COVEY, Judge

Judges Leadbetter and Simpson join in this dissenting opinion.

---

[6] Because the result of the Majority's decision effectively overrules this Court's *en banc Pennsylvania Builders* decision, it should explicitly say so.

[7] *See also Pa. Med. Soc'y v. Foster*, 585 A.2d 595 (Pa. Cmwlth. 1991).