## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Edward J. Timcho, Jr.,            :
           Petitioner      :
                                 :
       v.                   :    No. 756 C.D. 2015
                                 :    Submitted: November 13, 2015
Workers' Compensation Appeal    :
Board (City of Philadelphia),      :
           Respondent    :

BEFORE:   HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**                **FILED: January 27, 2016**

Petitioner Edward Timcho, Jr., (Claimant) petitions for review of an order of the Workers' Compensation Appeal Board (Board). The Board affirmed the decision of Workers' Compensation Judge Lawrence C. Beck (WCJ Beck), granting a modification petition filed by the City of Philadelphia (Employer). We affirm the Board.

On May 20, 2008, Claimant sustained a work-related injury, which Employer identified in a Notice of Compensation Payable (NCP), dated August 6, 2008, as a myocardial infarction. On or about November 11, 2008, Claimant filed a claim petition, and, on May 27, 2010, WCJ Patricia Bachman (WCJ Bachman) granted Claimant temporary total disability benefits and described Claimant's work injury as a heart attack and residual heart damage. WCJ

Bachman's May 2010 decision also denied an earlier modification petition filed by Employer. On or about August 18, 2011, Employer filed a second modification petition, seeking to change Claimant's compensation status from total disability to partial disability, following an impairment rating evaluation (IRE) indicating that Claimant's impairment was less than fifty percent.

WCJ Beck conducted two hearings, admitting into the record, *inter alia*, the IRE report written by the IRE physician, Lance Owen Yarus, D.O., the deposition testimony of Dr. Yarus, and WCJ Bachman's May 27, 2010 decision granting Claimant's claim petition and denying Employer's earlier modification petition. Claimant submitted into evidence only the NCP, a list of litigation costs, and a fee agreement.

In his IRE report, Dr. Yarus applied the American Medical Association's Guides to the Evaluation of Permanent Impairment, 6th Edition (Revised) (Guides).[1] Dr. Yarus noted in the IRE report that Claimant's main complaint was chest pain:

> He currently indicates that he has a burning and pressure sensation in his chest. He has no radiation of pain. The timing of his pain is occasional. The context of his pain is dependent upon activities. Symptoms are made worse with excessive activities. Relief is noted with medication and rest. He characterized the pain as coming and going.

---

[1] In *Protz v. Workers' Compensation Appeal Board (Derry Area School District)*, 124 A.3d 406, (Pa. Cmwlth. 2015), this Court held unconstitutional Section 306(a.2) of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *added by* the Act of June 24, 1996, P.L. 350, 77 P.S. § 511.2, based upon our conclusion that the General Assembly's proactive approval for physicians conducting IREs to use versions of the Guides beyond the Fourth Edition constituted an unconstitutional delegation of legislative authority. Petitioner has not raised an issue regarding the propriety of Dr. Yarus's use of a newer edition of the Guides. Thus, we need not consider the impact of our decision in *Protz* on this matter.

2

(Reproduced Record (R.R.) at 53a.) In addition to reviewing workers' compensation documents, Dr. Yarus also reviewed a report prepared by Nicholas De Pace, M.D.[2] (R.R. at 54a.) Dr. Yarus identified Claimant's condition as "[m]yocardial infarction secondary to coronary artery disease status post stent placement for thrombotic right coronary artery." (*Id.*) Dr. Yarus concluded that "[Claimant] meets the requirements for the definition of maximum medical improvement [(MMI)] as defined on page 26, subsection 2.5e [of the Guides]. He has limitations in his activities of daily living. His prognosis is poor." (*Id.*) Under the section of the IRE captioned "impairment rating and rationale," Dr. Yarus wrote:

> Chapter #4 [of the Guides], table #4-6 coronary artery disease class III "history of documented MI, angina with exertion or significant changes to ADLs to prevent angina and/or HF (heart failure). NYHA class III with a midrange default of 32%. The objective test findings place [Claimant] at C. History of no further symptoms and physical examination are consistent with class III. Therefore, the calculated total whole-person impairment percentage is 32%.

(*Id.*) Additionally, Dr. Yarus wrote:

> It should be noted that [Claimant] did not have any left ventricular deficits, congestive heart, or predisposition to cardiac arrhythmias. It was stated that he did have Crohn's disease, which would push his cardiac reserve and preclude his activities. His activities were not precluded on the basis of his cardiac disease solely.

---

[2] Employer refers to Dr. De Pace as a "treating physician." (Respondent's Brief at 4.) WCJ Bachman's decision, however, indicates that Dr. De Pace "examined Claimant at the request of [Employer]." (R.R. at 60a.) WCJ Bachman's decision suggests that Dr. De Pace's report was the result of his independent medical examination of Claimant. (R.R. at 59a.)

(*Id.*)

In his testimony, Dr. Yarus reiterated the observations and findings in his IRE report and explained his methodology, as follows:

> Well, in this type of problem, looking at [Table 4-6 in the Guides], there is only one table to assess the whole rating. That entailed the history, physical findings, and objective test results. This is predicated on the New York Heart Association criteria . . . . When I looked at the totality of his history, the information in the records, and knowing that he had stent placement for a thrombotic right coronary artery, I chose Class 3 because it best fits all of the parameters that he has as far as his condition . . . . [W]e always start out at a mid range default at 32 [in Class 3] . . . . In most cases . . . you have factors that may alter the default either to the left or to the right. And you have two numbers in the default range that you can move to. If there's no reason to move one way or the other in the calculation, then you stay at the middle default. And that's what I did here.

(R.R. at 18a-20a.) With regard to testing that had been performed on Claimant following the placement of the stent, Dr. Yarus indicated that Claimant did not have any deficits in his left ventricular function, a factor that, if present, would have potentially caused Dr. Yarus to conclude that Claimant had a higher impairment percentage. (R.R. at 20a.) Dr. Yarus also noted that Claimant did not have a predisposition to cardiac arrhythmias, another factor that might have altered his rating. (*Id.*)

On cross-examination, Claimant's counsel focused on how Dr. Yarus complied with references in the Guides requiring the use of objective testing. Dr. Yarus agreed that in performing an impairment rating for a person who has had coronary artery disease, Section 4.3 of the Guides requires evaluating physicians to consider objective, diagnostic studies, including stress tests, coronary angiograms,

4

and other related studies. (R.R. at 22a.) Dr. Yarus agreed that the Guides indicate that a person's left ventricular function should be determined through testing. (R.R. at 23a.) Dr. Yarus testified that he did not order such testing, but that Claimant had had an evaluation for his left ventricular function in 2009. (R.R. at 24a.) Dr. Yarus admitted that the 2009 studies were not performed in proximity to his IRE, but offered that the "Guide[s] is not specific as to time frame or assessment. It just says that you have to have an assessment . . . . I was satisfied that there was one done and ventricular function was intact." (R.R. at 24a-25a.) Counsel then asked the following question to which Dr. Yarus responded:

> Q. Okay. In order to get a completely accurate evaluation for impairment rating purposes, would you request that one of those studies be performed so that you can meet the criteria that are in the guidelines?
>
> A. No, I felt I met the criteria, again because a study was done. If there was an issue with his function, th[e]n other tests would have been done and I would have been privy to them, unless they are done and I missed them.

(R.R. at 25a.) Dr. Yarus acknowledged that he did not review results of the tests that had been conducted, but on re-direct examination, he testified that he reviewed the report Dr. De Pace generated, which indicated that results from the objective testing did not show abnormal results. (R.R. 26a-27a.)

The WCJ found that the 2009 objective tests indicated that Claimant had normal left ventricular function and that although "[t]here were no studies performed proximate to Dr. Yarus' examination . . . no specific time frame is set forth in the [Guides]. Dr. Yarus was satisfied that the 2009 study was sufficient." (Findings of Fact (F.F.) k, l.) The WCJ concluded that Claimant "had reached maximum medical improvement as of, at least, July 25, 2011," (Conclusion of Law (C.L.) d.) and that, "as of July 25, 2011, Claimant's permanent impairment rating

5

pursuant to the [Guides] is 32%" (C.L. e). Based upon an impairment rating below fifty percent, the WCJ modified Claimant's benefits from total to partial disability status.

Claimant appealed from the WCJ's decision to the Board, asserting that Dr. Yarus's opinion regarding his impairment rating was insufficient to support Employer's modification petition, based upon the fact that Dr. Yarus did not order objective tests in conducting the IRE. Claimant argued that Dr. Yarus's reliance upon tests from 2009 did not comply with the requirements of the Guides, asserting that testing must be done contemporaneously with an IRE. Claimant also argued that Dr. Yarus, an orthopedic surgeon, was not qualified to perform an IRE for a claimant whose injury is related to a cardiac condition. The Board affirmed the WCJ, concluding that the Guides does not specifically require testing as part of the IRE process and that the only requirement for physicians conducting IREs is that he or she be a Commonwealth-licensed physician, certified by an American Board of Specialties, and be active in clinical practice at least twenty hours per week.

Claimant petitions for review of the Board's order,[3] raising the sole question of whether the Board erred in affirming the WCJ's decision, because Dr. Yarus's IRE did not comply with the Guides. Section 306(a.2) of the Act provides, in pertinent part, as follows:

> (1) When an employe has received disability compensation pursuant to clause (a) for a period of one hundred four weeks, unless otherwise agreed to, the

---

[3] Our review is limited to considering whether substantial evidence supports necessary factual findings and whether any error of law or violation of constitutional rights occurred. 2 Pa. C.S. § 704.

employe shall be required to submit to a medical examination which shall be requested by the insurer within sixty days upon the expiration of the one hundred four weeks to determine the degree of impairment due to the compensable injury, if any. The degree of impairment shall be determined based upon an evaluation by a physician who is licensed in this Commonwealth who is certified by an American Board of Medical Specialties approved board or its osteopathic equivalent and who is active in clinical practice for at least twenty hours per week, chosen by agreement of the parties, or as designated by the department, pursuant to the most recent edition of the [Guides].

(2) If such determination results in an impairment rating that meets a threshold impairment rating that is equal to or greater than fifty percentum impairment under the [Guides], the employe shall be presumed to be totally disabled and shall continue to receive total disability compensation benefits under clause (a). If such determination results in an impairment rating less than fifty percentum impairment under the [Guides], the employe shall then receive partial disability benefits under clause (b) . . . .

. . . .

(6) Upon request of the insurer, the employe shall submit to an independent medical examination in accordance with the provisions of section 314 to determine the status of impairment . . . .

Under Section 306(a.2) of the Act, an insurer/employer bears the burden of proving that a claimant's whole person impairment rating is below fifty percent. *Westmoreland Reg'l Hosp. v. Workers' Comp. Appeal Bd. (Pickford)*, 29 A.3d 120, 127 n.10 (Pa. Cmwlth. 2011), *appeal denied*, 42 A.3d 295 (Pa. 2012).

Under Section 306(a.2) of the Act, in order to be subjected to an IRE, a claimant's injury must be deemed to be "permanent." *Combine v. Workers' Comp. Appeal Bd. (Nat'l Fuel Gas Distrib. Corp.)*, 954 A.2d 776, 779-80 (Pa. Cmwlth. 2008), *appeal denied*, 967 A.2d 961 (Pa. 2009). The concept of

7

"permanent" injury for the purposes of Section 306(a.2) of the Act is synonymous with a claimant's MMI. *Id.* Additionally, before an IRE physician may calculate an impairment rating, the physician must first determine that a claimant has reached MMI.[4] *Id.*

Section 2.3c of the Guides recognizes that the "optimal duration for recovery may vary considerably from days to months," depending on "the nature of the underlying pathology." The Guides provides that "[t]he clinical findings must indicate that the medical condition is static and well stabilized for the person to have reached MMI." Section 2.5e of the Guides defines MMI as

> a status where patients are as good as they are going to be from the medical and surgical treatment available to them. It can also be conceptualized as a date from which further recovery or deterioration is not anticipated, although over time (beyond 12 months) there may be some expected change. The Guides, however, does not permit the rating of future impairment. There can be some scenarios with individuals now at MMI but with potential for future progression of their disease.

The Guides also provides that

> MMI represents a point in time in the recovery process after an injury when further formal medical or surgical intervention cannot be expected to improve the underlying impairment. Therefore, MMI is not predicated on the elimination of symptoms and/or subjective complaints. Also, MMI can be determined if recovery has reached the stage where symptoms can be expected to remain stable with the passage of time, or can be managed with palliative measures that do not alter the

---

[4] Under Section 2.3c of the Guides, "[o]nly permanent impairment may be rated according to the Guides, and only after the status of 'Maximum Medical Improvement' (MMI) is determined."

8

underlying impairment substantially, within medical probability.

Also, "[MMI] does not preclude the deterioration of a condition that is expected to occur with the passage of time or as a result of the normal aging process; nor does it preclude allowance for ongoing follow-up for optimal maintenance of the medical condition in question." *Id*.

Section 4.3a of the Guides relates to "Coronary Artery Disease" and provides, in relevant part, as follows:

> 4.3a   Criteria for Rating Impairment due to Coronary Artery Disease
>
> . . . .
>
> Stress testing, preferably with cardiac imaging techniques, serves as the mainstay in evaluating the degree of damage and thus impairment due to CAD [(Coronary Artery Disease)]. *Left ventricular function must be determined in these individuals as an objective basis for impairment rating*. Coronary angiography is also included in the impairment classification tables, as it enables the quantitative assessment of atherosclerotic disease. Newer imaging techniques, such as cardiac MRI and CT angiography, also accurately quantify atherosclerotic disease and may be used for impairment rating purposes.
>
> *Impairment can be markedly altered with treatment programs such as cardiac rehabilitation, smoking cessation, and compliance with medications*. Patients often require intervention for their CAD that may be percutaneous (ie, percutaneous transluminal coronary angioplasty . . . and/or *stent placement*), or they may require coronary artery bypass grafting. *Impairment ratings should be determined after these procedures have been completed and the patient is at MMI, generally 3 to 6 months later*.

(R.R. at 48a-50a (emphasis added).)

9

Claimant contends that Section 4.3a of the Guides requires IRE physicians to order tests as part of the IRE process and that such tests must be conducted contemporaneously with an IRE. Claimant contends that Dr. Yarus failed to comply with this provision because (1) he did not order such tests as part of the IRE process; and (2) he admitted that he did not personally assess Claimant's left ventricular function, but, rather, relied upon the 2009 report and tests that had been performed relative to Claimant's heart attack and the treatment for his coronary condition.

Claimant argues that interpreting the Guides to permit IRE physicians to use stale objective tests as support for an impairment rating makes no sense in light of the requirement that an IRE physician must first determine that a claimant has reached MMI. (Petitioner's Brief at 19-20.) Claimant contends that MMI is not an issue until after the expiration of the 104-week benefit period (following which an employer first may request an IRE) and that it is illogical to permit the use of tests that have been performed before the determination of MMI becomes relevant to the IRE process. Claimant suggests that under Section 4.3c of the Guides, testing of left ventricular functioning must be done contemporaneously with an IRE, "[o]therwise, IRE doctors, as in this case, would be able to rely on stale diagnostic testing and results when attempting to . . . determine an accurate and current impairment rating." (Petition for Review at 8.) Based upon these arguments, Claimant contends that Dr. Yarus's opinion is not competent to support his impairment rating and that the Board erred in concluding that Dr. Yarus's opinion was sufficient to support the WCJ's decision to grant the modification petition.

10

We conclude that the Board did not err. Claimant is correct in pointing out that our General Assembly, by imposing upon employers a 104-week "waiting period," *Combine*, 954 A.2d at 780, reflected a concern (also contained in the Guides) "that impairment should not be considered permanent, which is synonymous with MMI, until a reasonable time has passed for healing or recovery to occur." *Id.* Thus, this Court has reinforced the notion that a claimant must have reached MMI—a status where a condition is deemed to be permanent and static, and not likely to improve, before a physician may render an opinion regarding the degree of whole person permanent impairment. We do not agree with Claimant's argument, however, that the timing of the testing in this case negates the reliability of such testing for the purpose of the IRE impairment rating in this matter.

Contrary to Claimant's arguments, the final sentence of Section 4.3a of the Guides supports the Board's reasoning, because it recognizes that physicians may render an impairment rating "generally three to six months" following treatments for and intervention with regard to a claimant's work-related condition. Although Section 306(a.2) of the Act prohibits employers from requesting IREs within the first 104 weeks following a work-related injury, the Act does not prohibit the use of tests that may have been performed within that time period.

In this case, it appears that: (1) Claimant had catheterization and stents implanted at the time of his hospitalization in 2008; and (2) Dr. De Pace reached a determination in 2009 (for the purpose of the earlier modification petition Employer filed), based upon an electrocardiogram, that Claimant's left ventricular function was intact notwithstanding Claimant's work-related injury. That evaluation occurred more than three-to-six months after Claimant's 2008 injury and treatment for his cardiac condition.

11

Dr. Yarus testified that he determined that Claimant had reached MMI based upon the criteria set forth in Section 2.5e of the Guides and because Claimant had limitations on daily activities and a poor prognosis. (R.R. at 17a.) Claimant has not challenged that determination. Thus, Dr. Yarus did not reach a determination concerning Claimant's impairment rating until after he determined in the IRE that Claimant had reached MMI.

As the Board noted, Section 4.3a of the Guides does not contain a directive regarding the necessity to perform objective tests in the process of conducting an IRE and does not include any direction regarding the timing of such tests. Although it is clear that objective tests are necessary in order to comply with the requirement to evaluate left ventricular functioning, the Guides are silent as to when testing should be done relative to an IRE impairment rating. The second quoted paragraph of Section 4.3a of the Guides emphasizes the notion that treatment may have a marked effect on impairment. In this case, it is clear that Claimant had a stent placed and was prescribed Coumadin therapy, which Dr. Yarus recognized Claimant did not tolerate at high doses, stopped smoking, and his treating physician has apparently prescribed various medications. In accordance with the recommendations and directives set forth in Section 4.3a of the Guides, testing is appropriate at a period of time generally three to six months after treatment has occurred. The Guides places no other timing limitations on the performance of tests used to determine an impairment rating. Thus, we conclude that Dr. Yarus's reliance upon the report of Dr. De Pace and the testing performed in 2009 complied with Section 4.3a of the Guides.

Claimant also argues that the Board erred in concluding that Dr. Yarus, an orthopedic specialist, was not qualified under Section 306(a.2) of the

Act to perform an IRE on a claimant whose injury is related to a cardiac condition. This Court recently held that the question of whether a physician is qualified to perform an IRE is governed by the Act. *IA Constr. v. Workers' Comp. Appeal Bd. (Rhodes)*, 110 A.3d 1096, 1102 (Pa. Cmwlth.), *appeal granted on different grounds*, 121 A.3d 981 (Pa. 2015). A WCJ may not impose greater qualifications than those set forth in the Act. *Id.* Here, there is no dispute that Dr. Yarus satisfied the statutory standards to be qualified as an IRE physician. Consequently, we find no merit in Claimant's argument to the contrary.

Accordingly, we affirm the Board's order.

 

 

 

P. KEVIN BROBSON, Judge

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Edward J. Timcho, Jr., :
                   Petitioner :
                                 :
            v. : No. 756 C.D. 2015
                                 :
Workers' Compensation Appeal :
Board (City of Philadelphia), :
                 Respondent :

# **O R D E R**

AND NOW, this 27th day of January, 2016, the order of the Workers'
Compensation Appeal Board is AFFIRMED.

_____
P. KEVIN BROBSON, Judge